# ASSET PURCHASE AGREEMENT

### Dated as of March 10, 2010

### by and between

## DUNHILL ENTITIES, L.P.,
## DUNHILL ENTITIES GP, LLC,
## DUNHILL TERMINALS, L.P.,
## DUNHILL TERMINALS GP, LLC,
### and

## ARC TERMINALS LP

US 301674v.3

**EXHIBIT**

A

Desc Exhibit

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (herein, together with the Schedules and Exhibits attached hereto, referred to as this "Agreement"), dated as of March 10, 2010, is by and between **Dunhill Entities, L.P.**, a Texas limited partnership, **Dunhill Entities GP, LLC**, a Texas limited liability company, **Dunhill Terminals, L.P.**, a Texas limited partnership, **Dunhill Terminals GP, LLC**, a Texas limited liability company (collectively, "Sellers" and each a "Seller"), **Arc Terminals LP**, a Delaware limited partnership ("Buyer"), and the persons listed on the Joinder signature page hereto for the purposes set forth therein. Capitalized terms used in this Agreement are defined or otherwise referenced in Section 8.03. Sellers and Buyer may, from time to time, be referred to herein collectively as "Parties" or each a "Party".

## W I T N E S S E T H:

WHEREAS, the Sellers have concluded that, promptly after the date hereof, each of the Sellers will file voluntary petitions ("Voluntary Petitions") for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Alabama, (the "Bankruptcy Court"), such cases to be referred to collectively, as the "Bankruptcy Cases," and, individually, as the "Bankruptcy Case";

WHEREAS, contemporaneously with the execution of this Agreement, the Buyer will consummate the acquisition of the Loans pursuant to that certain Sale and Assignment Agreement between Regions Bank, an Alabama banking corporation, and Buyer (the "Loan Purchase");

WHEREAS, subject to the entry of the Sale Order (as defined herein) Sellers desire to sell to Buyer, and Buyer desires to purchase from Sellers, free and clear of all Encumbrances (as defined herein) other than Permitted Encumbrances (as defined herein) pursuant to Bankruptcy Code §§ 105, 363 and 365, Sellers' Petroleum and Other Product storage facilities and associated terminaling assets located in Chickasaw, Alabama (the "Chickasaw Terminal") and Mobile, Alabama (the "Blakeley Terminal"; together with the Chickasaw Terminal, the "Terminals");

WHEREAS, the parties hereto have agreed that subject to the entry of the Sale Order and subject to the terms and conditions of this Agreement, Sellers will sell and Buyer will purchase and acquire the Purchased Assets (as defined herein) free and clear of all Encumbrances (as defined herein) other than Permitted Encumbrances (as defined herein) pursuant to the terms of this Agreement and the Sale Order; and

WHEREAS, in connection with the purchase and sale of the Purchased Assets (as defined herein), Buyer is willing to provide the funds for the satisfaction of certain liabilities of Sellers on the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual representations and warranties and covenants made herein, Buyer and Sellers, each intending to be legally bound, hereby agree as follows:

ARTICLE I

PURCHASE AND SALE OF ASSETS

Section 1.01   Purchase and Sale of Assets.

(a)   At the Closing, on the terms and subject to the conditions set forth in this Agreement, Sellers shall sell, convey, transfer, assign and deliver to Buyer, free and clear of any Encumbrances other than Permitted Encumbrances, and Buyer shall purchase and acquire from Sellers, all of the right, title and interest of Sellers in and to all of the assets and rights owned, used or to be used by Sellers in connection with the Terminals or the Business (collectively, the "Purchased Assets"), including the following:

(i)   the real property (including mineral rights associated therewith), leasehold interests, easements, licenses, servitudes, rights-of-way, and other interests in real property of Sellers, all as more particularly listed in Schedules 3.07(a) and (b), in each case together with Sellers' right, title and interest in all Fixtures and Improvements, thereon (collectively, the "Facilities");

(ii)   all furnishings, furniture, computer equipment and hardware, fittings, equipment, machinery, tools, apparatus, pipelines, sewers, appliances, implements, spare parts, supplies, sundries, IT equipment and other tangible personal property and interests therein located at the Facilities or used or held for use in connection with the Business (including, in the case of any computer hardware, the right to use software applications loaded on such computers (provided that the associated software license is transferrable)), and any confidential information, know-how, proprietary rights in information, lists of suppliers, vendors, customers and distributors used in the conduct of the Business (collectively, the "Personal Property");

(iii)   computer software and databases, patents, inventions (whether patentable or not), copyrights and technology, in each case associated with the Business or the Purchased Assets (the "Intellectual Property");

(iv)   the Permits relating to the Business, including the Permits that are listed or described on Schedule 1.01(a)(iv), in each case only to the extent assignable or transferrable (the "Assigned Permits");

(v)   the contracts, leases, licenses, indentures, agreements, commitments and other legally binding arrangements, together with all amendments thereto and ratifications thereof, ("Contracts") to which a Seller is a party or by which a Seller is bound, that are listed in Schedule 3.07(a) or Schedule 1.01(a)(v), and all of Sellers' rights, title and interest to any and all rents due thereunder, including any prepaid rents and security and other deposits held by a Seller in connection with such Contracts (the "Assigned Contracts");

2

(vi) the historical books, ledgers, files, reports, records, plans, specifications, surveys, drawings, licenses, Permits and manuals relating to the Business, in whatever form stored or retained ("Assigned Records");

(vii) all deposits, advance payments, prepaid items and expenses, rights of offset and credits and claims for refund that relate to the Business, including those listed in Schedule 1.01(a)(vii), other than retainers paid to Sellers' professional advisors in connection with the Bankruptcy Cases;

(viii) any rights, claims, defenses, counterclaims, cross-claims or causes of action of Sellers against customers, clients or vendors of the Business, any counterparties to the Assigned Contracts or any payees with respect to Assumed Liabilities; and

(ix) all of Sellers' accounts receivable and other rights to receive payments arising in connection with the Business, whether before or after the Closing.

(b) Notwithstanding anything in this Agreement to the contrary, specifically excluded from the Purchased Assets are the right, title and interest of Sellers in or to any of following (collectively, the "Excluded Assets"):

(i) all assets identified on Schedule 1.01(b)(i);

(ii) Sellers' charter documents, minutes and limited partnership or limited liability company record books and corporate seals;

(iii) all cash and cash equivalents held by Sellers;

(iv) all the assets of the Seller Plan;

(v) all rights of Sellers under this Agreement and any other agreements and instruments executed and delivered in connection with this Agreement;

(vi) all Tax records, refunds and credits to the extent they relate exclusively to Taxes that constitute Excluded Liabilities; and

(vii) all Capital Stock of Sellers or their Affiliates.

Section 1.02    Purchase and Sale.

(a) In consideration of the sale, conveyance, transfer, assignment and delivery of the Purchased Assets by Sellers pursuant to Section 1.01(a), Buyer agrees (y) to pay the Purchase Price of at least $40,500,000.00 which shall be comprised of (i) the Initial Credit Bid Amount; and (ii) the Cash Consideration, and (z) to undertake, assume and agree to perform, and otherwise pay, satisfy and discharge when due, the following liabilities, obligations or commitments of Sellers (the "Assumed Liabilities") (provided, the Assumed Liabilities shall not include the Excluded Liabilities or any liabilities resulting from or relating to any breach or non-

3

fulfillment of any representation or warranty, covenant or agreement on the part of Seller pursuant to this Agreement):

        (i)      all liabilities, obligations and commitments of Sellers under the Assigned Contracts and the Assigned Permits that arise after and relate to the period following the Closing which are not Cure Amounts; and

        (ii)     all liabilities, obligations and commitments assumed under Section 5.05(b)(ii).

        (b)    At the Closing, on the terms and subject to the conditions set forth in this Agreement, Sellers shall assign to Buyer and Buyer shall assume the Assumed Liabilities pursuant to Bankruptcy Code § 365; provided, however, that without limiting either party's rights or obligations under this Agreement, Sellers shall assign such rights and obligations only to the extent that such rights and obligations are assignable under Bankruptcy Code § 365, and no action hereunder shall constitute an assignment thereof, except to such extent; provided, further, that to the extent consent of any Person or Governmental Entity to the assignment, or notice to any Person or Governmental Entity of the assignment, is required pursuant to Bankruptcy Code § 365, no assignment or attempted assignment will be deemed to have been effected by the provisions of this Agreement without such consent or notice. To the extent that Bankruptcy Code § 365 does not permit Sellers to assign any Assigned Contract, or any required consent to assign any such Assigned Contract is not obtained, in either case that would otherwise constitute a Purchased Asset, Sellers shall use their commercially reasonable and good faith efforts to (i) provide to Buyer, at the request of Buyer, the benefits of any such Assigned Contract, and (ii) enforce and perform, at the request and expense of Buyer, for the account of Buyer, any rights or obligations of Sellers arising from any such Assigned Contract against or in respect of any third party, including the right to elect to terminate any Assigned Contract in accordance with the terms thereof upon the advice of Buyer, or otherwise enter into with Buyer such other arrangements sufficient to provide equivalent benefits and burdens to Buyer. All Cure Amounts in connection with the assignment to and assumption by, Buyer of any Assigned Contracts hereunder shall be paid out of the Cash Consideration.

        (c)    Notwithstanding anything in this Agreement to the contrary, Buyer shall not assume, and Sellers shall retain and be responsible for, the payment, satisfaction, performance and discharge of, the following liabilities, obligations or commitments, (collectively, the "Excluded Liabilities"):

        (i)      any liability, obligation or commitment, whether express or implied, liquidated, absolute, accrued, contingent or otherwise, or known or unknown, to the extent arising out of (A) the construction, ownership, use, maintenance and operation of the Purchased Assets or the operation or conduct of the Business prior to the Closing or (B) the operation or conduct by Sellers or their Affiliates of any business other than the Business;

        (ii)     any liability, obligation or commitment under any Assigned Contract or Assigned Permit that relates to the period prior to the Closing, whether arising before or after the Closing;

4

(iii)     any liability, obligation or commitment relating to, or arising out of, any Excluded Asset or the distribution to, or ownership or operation by, a Seller or any other Person of any Excluded Asset;

(iv)     any indebtedness of Sellers or their Affiliates;

(v)     any liability, obligation, commitment associated with a Seller's or Seller's Affiliate's default or otherwise under any Permit, governmental authorization or Contract prior to the Closing (including any penalties, fines or assessments arising under or relating to the Gulf Opportunity Zone Act of 2005 ("GO Zone") or any other tax abatement, tax holiday or similar agreements or arrangements);

(vi)     any worker's compensation claims, longshoreman claims or similar claims by employees, contractors or others filed or initiated before or after the Closing but which relate to acts, omissions, or occurrences prior to the Closing;

(vii)     except as set forth in Section 5.05(b), all liabilities and obligations for (i) Transfer Taxes, (ii) sales and use Taxes, (iii) Taxes of Sellers, (iv) Taxes that relate to the Purchased Assets or Business for taxable periods (or portions thereof) ending on or before the Closing Date, including, without limitation, Taxes allocable to Sellers pursuant to Section 5.05(b), (v) payments under any Tax allocation, sharing or similar agreement (whether oral or written), and (vi) Taxes of Sellers for the unpaid Taxes of any person under Treasury Regulation Section 1.1502-6 (or any similar provision of state, local or foreign law), as a transferee or successor, by contract or otherwise;

(viii)     any liability, obligation or commitment arising under, related to, or based upon any Seller Plan, or, any other compensation, benefit or similar plan, agreement, contract, policy or arrangement;

(ix)     any liability, obligation or commitment (A) to the extent such liability, obligation or commitment relates to, or arises out of, the employment of any employee, consultant or advisor or former employee, consultant or advisor of Sellers or any of their Affiliates, and (B) any liability, obligation or commitment that relates to, or arises out of, the termination of the employment of any current or former employee, consultant or advisor of Sellers or their Affiliates;

(x)     any liability, obligation or commitment for (A) any Environmental Condition first existing or occurring prior to the Closing or (B) arising out of or in connection with periods or activity prior to the Closing Date related to OSHA, EEOC, EPA or any other Governmental Entity, or the violation of any Legal Requirement.

(xi)     any liability, obligation or commitment accruing or attributable to any period prior to the Closing with respect to any accounts payable or Encumbrances arising from such accounts payable related to the Purchased Assets;

(xii)     any liability, obligation or commitment for any claim for overcharges or amounts due to any customers of a Seller for periods prior to the Closing, including resulting from any improvements or repairs made by customers to the Terminals;

5

US 301674v.3

(xiii) any liability, obligation or commitment for any claim by any customer for inventory loss inconsistent with the Closing Date Tank Volumes;

(xiv) any Cure Amounts payable with respect to any Assigned Contract; and

(xv) any liabilities, obligations and commitments in respect of costs and expenses incurred by Sellers or the Business in respect of or relating to this Agreement, including compliance by Sellers with the terms hereof.

Section 1.03    Sellers' Chapter 11 Bankruptcy Case.

(a)    All of the signatories to this Agreement, including those by way of joinder, stipulate and agree that (i) the aggregate principal amount due and owing on the Loans is not less than $58,355,441 and that such Loans are secured by a valid, binding, first and prior, duly perfected security interest in the Collateral and (ii) the Loans and Collateral are not subject to any defense, affirmative defense, avoidance, offset, claim, counterclaim or attack under any legal or equitable theory.

(b)    Simultaneously with the filing of the Voluntary Petitions, the Sellers shall file a motion pursuant to §§ 363 and 365 of the Bankruptcy Code in form and substance reasonably acceptable to the Parties and their counsel ("Bid Procedures and Sale Motion") asking the Bankruptcy Court (i) to approve the Buyer as "Stalking Horse Buyer" in connection with sale of the Purchased Assets, (ii) to establish bidding procedures, for any competing purchase offers (the "Bid Procedures"), which shall include bidder protections satisfactory to Buyer, (iii) to schedule a hearing on the approval of the Buyer as Stalking Horse Buyer and establishment of the Bid Procedures, and (iv) to authorize and approve the transactions contemplated herein. The Sellers shall use their best efforts to obtain an order, the form and substance of which shall be reasonably acceptable to the Buyer (the "Bid Procedures Order") within twenty (20) days of the Voluntary Petition filing, approving the Buyer as Stalking Horse Buyer, and establishing the Bid Procedures. The Sellers shall use their best efforts to obtain a setting of the hearing to approve the sale as specified in the Bid Procedures Order within thirty (30) days of the entry of such Bid Procedures Order. The Bid Procedures shall provide, among other things, that Buyer may increase the amount of the Purchase Price payable under this Agreement. If the Bankruptcy Court approves a sale of the Purchased Assets to any Person other than the Buyer, Sellers and Buyer agree that the Sale Order so providing shall require that the proceeds from such sale (less the Cash Consideration amount) shall be paid to Buyer.

(c)    For the avoidance of doubt, all of Sellers' costs and expenses relating to the filing, pendency or consummation of the Bankruptcy Cases shall be the responsibility of Sellers and shall not be chargeable to Buyer nor be an upward adjustment to the Purchase Price.

Section 1.04    Allocation of Purchase Price. Not later than sixty (60) days after the Closing Date, Buyer shall prepare and deliver to Sellers copies of Form 8594, *Asset Acquisition Statement*, and any required exhibits thereto (the "Asset Acquisition Statement") allocating the Purchase Price among the Purchased Assets. Buyer shall prepare and deliver to Sellers from time to time revised copies of the Asset Acquisition Statement (the "Revised Statements") so as

6

to report any matters on the Asset Acquisition Statement that need updating (including purchase price adjustments, if any). A preliminary schedule to the purchase price allocation is attached hereto as Schedule 1.04. The Purchase Price paid by Buyer for the Purchased Assets shall be allocated in accordance with the Asset Acquisition Statement or, if applicable, the last Revised Statements, provided by Buyer to Sellers, and all income Tax Returns and reports filed by Buyer and Sellers shall be prepared consistently with such allocation. For purposes of this Section 1.04, the Purchased Assets include the covenant not to compete as set forth in Section 5.10. In the event that Sellers dispute Buyer's allocation of purchase price under of this Section 1.04, the Parties shall attempt in good faith to resolve such dispute. If such dispute is not resolved within thirty (30) days thereafter, the Parties shall submit the dispute to a mutually acceptable national independent accounting firm for resolution, which resolution shall be final, conclusive and binding on the parties. Notwithstanding anything in this Agreement to the contrary, the fees and expenses of the independent accounting firm in resolving the dispute shall be borne by Sellers.

Section 1.05    Further Assurances.  At the Closing and from time to time after the Closing, at the request of Buyer and without further consideration, Sellers shall promptly execute and deliver to Buyer such certificates and other instruments of sale, conveyance, assignment and transfer, and take such other action, as may reasonably be requested by Buyer more effectively to sell, convey, assign and transfer to and vest in Buyer or to put Buyer in possession of the Purchased Assets and consummate the transactions contemplated by this Agreement. Following the Closing, to the extent any Seller or any Affiliate of any Seller determines that any Seller or any Affiliate of any Seller owns any assets (including Contracts) which are related to the Purchased Assets or the Business, then Sellers shall promptly notify Buyer of the existence of such assets, describe such assets in detail, address any reasonable inquiries that Buyer may have regarding such assets, and, at Buyer's request, transfer, or cause their respective Affiliates to transfer, such assets to Buyer without any additional consideration therefor. If, after the Closing, Buyer determines that any Seller or any Affiliate of any Seller owns any assets (including Contracts) which are related to the Purchased Assets or the Business, then Sellers shall address any reasonable inquiries that Buyer may have regarding such assets, and, at Buyer's request, transfer, or cause their respective Affiliates to transfer, such assets to Buyer without any additional consideration therefore.

ARTICLE II

CLOSING; TERMINATION

Section 2.01    Closing Date.  The closing of the transaction contemplated hereby (the "Closing") shall take place at the offices of Vinson & Elkins LLP, 666 Fifth Ave, 26th Floor, New York, New York, on the later of (a) five Business Days after the date on which satisfaction (or valid waiver) of the conditions set forth in Article VI (except for the conditions which by their terms are to be satisfied at or immediately prior to the Closing) has occurred and (b) June 18, 2010, or such other location, time or date as Buyer and Sellers agree. The date upon which the Closing occurs is herein referred to as the "Closing Date." The Closing shall be deemed to be effective as of 12:01 a.m. on the Closing Date where the Purchased Assets are located.

7

Section 2.02    Instruments of Conveyance, Transfer, Assumption, Etc.   (a)   Sellers shall execute, if applicable, and deliver to Buyer at the Closing the following (the "Sellers' Closing Deliverables"):

    (i)    the Closing Documents;

    (ii)    a receipt for the Purchase Price;

    (iii)    certificates of title for any included and listed vehicles;

    (iv)    a certificate of the Secretary or an Assistant Secretary (or the equivalent thereof) of each Seller certifying that the resolutions adopted by the Board of Directors (or the equivalent thereof) of each Seller attached thereto were duly and validly adopted and are in full force and effect, and authorizing the execution and delivery by such Seller of this Agreement, and the performance by such Seller of its obligations hereunder;

    (v)    a certificate of the Secretary or an Assistant Secretary (or the equivalent thereof) of each Seller as to the incumbency of any of Seller's officers or authorized persons who have executed any document delivered at the Closing;

    (vi)    a certificate of non-foreign status of each Seller (or, if applicable, its owner for U.S. federal income tax purposes) which meets the requirements of Treasury Regulation Section 1.1445-2(b)(2);

    (vii)    each of the certificates and other documents contemplated by Section 6.02 hereof; and

    (viii)    a certified copy of the Sale Order.

    (b)    Buyer shall execute, if applicable, and deliver to Sellers at the Closing the following (the "Buyer's Closing Deliverables"):

    (i)    the Closing Documents;

    (ii)    a certificate of the Secretary or an Assistant Secretary of Buyer certifying that the resolutions adopted by Buyer's Board of Directors (or equivalent thereof) attached thereto were duly and validly adopted and are in full force and effect, and authorizing the execution and delivery by Buyer of this Agreement, and the performance by Buyer of its obligations hereunder;

    (iii)    a certificate of the Secretary or an Assistant Secretary of Buyer as to the incumbency of any officers of Buyer who have executed any document delivered at the Closing; and

    (iv)    each of the certificates and other documents contemplated by Section 6.03 hereof.

8

Section 2.03    Escrow of Closing Deliverables; Payment of Cash Consideration.

(a)     Immediately prior to the Closing, Sellers shall deliver the Sellers' Closing Deliverables and Buyer shall deliver the Buyer's Closing Deliverables to the Title Company to be held in escrow and released only in accordance with this Section 2.03.

(b)     Once the Closing Deliverables have been so deposited, Buyer shall pay the Cash Consideration as follows:

(i)     first, by wire transfer of immediately available funds, on behalf of Sellers to accounts designated by Sellers, an amount equal to the aggregate Cure Amounts payable in connection with the assignment to, and assumption by, Buyer of the Assigned Contracts  (provided that Buyer shall in no event be required to transfer any amount in excess of the Cash Consideration); and

(ii)     second, by wire transfer of immediately available funds to Sellers to the accounts designated on Schedule 2.03(b)(ii), the remainder of the Cash Consideration not paid pursuant to Section 2.03(b)(i), if any.

(c)     Thereafter, the Title Company shall release the Closing Deliverables from escrow and the Closing shall occur.

Section 2.04     Termination.  Anything contained in this Agreement other than in this Section 2.04 to the contrary notwithstanding, this Agreement may be terminated in writing at any time:

(a)     without liability on the part of any party hereto by mutual written consent of Buyer, on one hand, and Sellers, on the other hand;

(b)     without liability on the part of any party hereto  (unless occasioned by reason of a breach by any party hereto of any of its representations, warranties or obligations hereunder) by either Buyer, on the one hand, or Sellers, on the other hand, if the Closing shall not have occurred by July 31, 2010 (or such later date as may be agreed upon in writing by the Parties) (the "Termination Date");

(c)     by Buyer, if a Seller shall breach any of its representations, warranties or obligations hereunder and such breach shall not have been cured or waived and such Seller shall not have provided reasonable assurance that such breach will be cured on or before the Termination Date; provided, however, that a breach by a Seller of any of its representations, warranties or obligations hereunder shall not give rise to a right of termination under this Section 2.04 unless such breach, together with all other breaches by such Seller or any other Seller that have not been cured or waived and with respect to which such Seller shall not have provided reasonable assurance that such breach will be cured on or before the Termination Date, would result in the failure of the condition set forth in Section 6.02(b);

(d)     by Sellers, jointly, if Buyer shall breach any of its representations, warranties or obligations hereunder and such breach shall not have been cured or waived and Buyer shall not have provided reasonable assurance that such breach will be cured on or before

9

US 301674v.3

the Termination Date; provided, however, that a breach by Buyer of any of its representations, warranties or obligations hereunder shall not give rise to a right of termination under this Section 2.04 unless such breach, together with all other breaches by Buyer that have not been cured or waived and with respect to which Buyer shall not have provided reasonable assurance that such breach will be cured on or before the Termination Date, would result in the failure of the condition set forth in Section 6.03(a); and

(e)    by Buyer or Sellers if any permanent injunction, decree or judgment by any Governmental Entity preventing the consummation of the transactions contemplated hereby shall have become final and non-appealable;

(f)    by Buyer, if the Sellers have not filed Voluntary Petitions by April 1, 2010;

(g)    by Buyer, if the Bankruptcy Court has not entered the Bid Procedures Order by April 16, 2010;

(h)    by Buyer or Sellers, if Buyer is not the Winning Bidder;

(i)    by Buyer, if the Sale Order has not become a final and nonappealable order by June 1, 2010; or

(j)    by Buyer, if the Bankruptcy Case is converted to a case under Chapter 7 of the Bankruptcy Code or is dismissed.

## ARTICLE III

### REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers hereby represent and warrant, jointly and severally, to Buyer, as of the date of this Agreement and as of the Closing Date, as follows:

Section 3.01    Organization, Standing and Power.    Each Seller is a limited partnership, limited liability company or corporation duly organized, validly existing and in good standing under the laws of its state of organization or incorporation and has all limited partnership, limited liability company or corporate power and authority to carry on its business as now being conducted and to own its properties.

Section 3.02    Authority; Enforceability.    Sellers have full limited partnership, limited liability company or corporate power and authority to enter into this Agreement at the Closing and, subject to approval of the Bankruptcy Court, to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by each Seller of this Agreement at the Closing have been duly authorized by all requisite limited partnership, limited liability company or corporate action. This Agreement has been, as of the Closing Date, duly executed and delivered by each Seller, and (assuming due execution and delivery by Buyer and subject to approval of the Bankruptcy Court) this Agreement constitutes, and when executed and delivered will constitute, a valid and binding obligation of each Seller that is a party thereto, enforceable in accordance with its terms, except as such enforceability may be limited by bankruptcy,

10

US 301674v.3

insolvency, reorganization or similar laws affecting creditors' rights generally or by general equitable principles.

Section 3.03    No Conflict; Consents. Subject to approval of the Bankruptcy Court, the execution and delivery by Sellers of this Agreement do not, and the execution and delivery by Sellers of each Ancillary Agreement will not, and the consummation of the transactions contemplated hereby and thereby and Sellers' compliance with the terms hereof and thereof will not, conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any obligation or to loss of a benefit under, or to increased, additional, accelerated or guaranteed rights or entitlements of any Person under, or result in the creation of any Encumbrance upon any Purchased Asset under, any provision of (i) the limited partnership agreement, operating agreement, certificate of limited partnership, by-laws, certificate of incorporation, or other organizational documents of Sellers, (ii) except as set forth on Schedule 3.03, any Assigned Contract or (iii) any judgment, order, award, ruling, injunction or decree ("Order"), or statute, law, code, ordinance, rule or regulation ("Applicable Law"), applicable to Sellers or any Purchased Asset. No consent, approval, license, permit, order or authorization or registration, notification, declaration or filing with ("Consent") any federal, state or local government or any court of competent jurisdiction, administrative agency or commission or other governmental authority or instrumentality (a "Governmental Entity") or other Person, is required to be obtained or made by or with respect to Sellers in connection with the execution, delivery and performance of this Agreement or any Ancillary Agreement or the consummation of the transactions contemplated hereby and thereby, other than those set forth on Schedule 3.03.

Section 3.04    Financial Statements; Undisclosed Liabilities. Except as set forth on Schedule 3.04, the Reference Balance Sheet has been prepared in accordance with U.S. GAAP (except for the absence of footnotes) and fairly presents in all material respects the financial condition of the Business as of the Reference Balance Sheet Date. To the knowledge of Sellers, except as set forth on Schedule 3.04, there are no liabilities or obligations of any nature (whether absolute, contingent, matured, unmatured or otherwise) of the Business, except (i) liabilities that are reflected or reserved against on the Reference Balance Sheet under U.S. GAAP, (ii) liabilities incurred in the ordinary course of business and consistent with past practice since the Reference Balance Sheet Date, (iii) liabilities incurred since the Reference Balance Sheet Date outside the ordinary course of business that do not exceed $25,000 in the aggregate and (iv) liabilities that constitute Excluded Liabilities. Since the Reference Balance Sheet Date, except as set forth in Schedule 3.04, there have been no Related Party Transactions.

Section 3.05    Litigation. Except as set forth in Schedule 3.05, as of the date hereof, there is (a) no outstanding Order of any Governmental Entity involving Sellers and relating to the Purchased Assets or by which any of the Purchased Assets are bound, (b) no legal proceeding pending or, to Sellers' knowledge, threatened against any Seller and relating to the Purchased Assets or otherwise involving the Purchased Assets or the Business, (c) to Sellers' knowledge there are no facts or circumstances existing that could reasonably be expected to result in legal proceedings against any Seller relating to the Purchased Assets or otherwise involving the Purchased Assets or the Business, (d) no investigation pending or, to Sellers' knowledge, threatened by any Governmental Entity against any Seller and relating to the Purchased Assets or otherwise involving the Purchased Assets, and (e) there is not nor has there been commenced or

11

to the knowledge of Sellers threatened by any third party against any Seller or any Seller's principals, officers, directors or Affiliates, any proceeding (i) involving any challenge to, or seeking damages or other relief in connection with, the transactions contemplated by this Agreement or (ii) that may reasonably be expected to have the effect of preventing, delaying, making illegal, or otherwise interfering with the transactions contemplated by this Agreement.

Section 3.06    Personal Property.    Sellers have good and valid title to all of the Personal Property, free and clear of all Encumbrances, except the Encumbrances set forth on Schedule 3.06 that will be discharged prior to the Closing and Permitted Encumbrances. The Personal Property constitutes all of the all furnishings, furniture, computer equipment and hardware, fittings, equipment, machinery, tools, apparatus, pipelines, sewers, appliances, implements, spare parts, supplies, sundries, IT equipment and other tangible personal property and interests (including, in the case of any computer hardware, the right to use software applications loaded on such computers, and any confidential information, know-how, proprietary rights in information, lists of suppliers, vendors, customers and distributors) used or held for use in connection with the operation of the Business. This Section 3.06 does not relate to real property or interests in real property, such items being the subject of Section 3.07.

Section 3.07    Interests in Real Property.

(a)    (i)    Schedule 3.07(a) sets forth, under the heading "Leased Real Property," a complete and correct list of each parcel of real property or an interest in real property held under a lease or sublease by Seller and used or held for use in the Business ("Leased Real Property"), and identifying the lease or sublease to which such parcel is subject. Schedule 3.07(a) sets forth, under the heading "Owned Real Property," a complete and correct list of each parcel of real property or an interest in real property owned in fee by a Seller and used or held for use in the Business ("Owned Real Property"), and identifying the deed to which such parcel is subject.

(ii)    To Sellers' knowledge, Sellers have heretofore made available to Buyer complete and correct copies of each lease and sublease of Leased Real Property and of each deed, mortgage, title insurance policy, survey and other documents relating to or affecting the Owned Real Property and have not intentionally withheld any such documents.

(b)    (i) To Sellers' knowledge, Schedule 3.07(b)(i) sets forth, under the heading "Easements," a complete and correct list of each interest in real property held by a Seller under an easement agreement, license, servitude, Permit or right of way and used or held for use in the Business ("Easement Areas"), and identifying the easement agreement, license or right of way to which such Easement Area is subject.

(ii)    (A) To Sellers' knowledge, Sellers have heretofore made available to Buyer complete and correct copies of each easement agreement, license, Permit or right of way affecting the Easement Areas and have not intentionally withheld any such documents, and (B) except as set forth on the title policy attached as Schedule 3.07(b)(ii), to Sellers' knowledge, no such other easement agreement, license, Permit or right of way exist.

12

US 301674v.3

(c)  Each Seller has (i) good and marketable title to the leasehold estates in all its Leased Real Property, and (ii) good and marketable fee simple title to its Owned Real Property, in each case, free and clear of all Encumbrances, other than Permitted Encumbrances and the Encumbrances set forth on Schedule 3.07(c) that will be discharged at or prior to the Closing.

(d)  Sellers have good and marketable title to the interests in real property described in the Easement Areas, free and clear of all Encumbrances, other than Permitted Encumbrances and Encumbrances that will be discharged at or prior to the Closing, and there are no defaults by it as holder of the rights thereunder.

(e)  Except as set forth in Schedule 3.07(e), Sellers have good and valid rights of ingress and egress to and from all the Real Property, and, to Sellers' knowledge, there are no threatened proceedings that could have the effect of impairing or restricting such rights of ingress and egress.

(f)  Except as set forth in Schedule 3.07(f), Sellers have good and valid rights of ingress and egress to and from all the Easement Areas.

(g)  Except for Permitted Encumbrances, Sellers own or have the right to exclusively occupy and use the Facilities, including the Real Property.

(h)  To Sellers' knowledge, the Real Property constitutes all of the real property, leasehold, interests, easements, licenses, rights-of-way, and other interests in real property used or held for use in connection with the operation of the Business.

(i)  Except as set forth on Schedule 3.07(i), all Taxes and assessments applicable with respect to the Owned Real Property for periods ending on or prior to the Closing Date and for the most recent applicable tax period and all prior years, have been paid, and none of the same are presently, or at the Closing will be, delinquent.

(j)  Except as set forth on Schedule 3.07(j), the present and planned future use of and improvements on the Owned Real Property and the Leased Real Property, are in conformity in all material respects with all applicable Laws, including without limitation all applicable zoning laws, ordinances and regulations and with all deed restrictions of record, and no Seller has any knowledge of any proposed change therein that would affect any of the Real Property or its use in the business currently conducted thereon.

Section 3.08   Tax Matters.

(a)  For purposes of this Agreement:

"Code" means the Internal Revenue Code of 1986, as amended.

"Tax" or "Taxes" means all (i) federal, state, local, foreign and other taxes, assessments, duties or similar charges of any kind whatsoever, including all corporate franchise, income, sales, use, ad valorem, receipts, value added, profits, license, withholding, payroll, employment, excise, property, net worth, capital gains, transfer, stamp, documentary, social security, payroll,

13

US 301674v.3

environmental, alternative minimum, occupation, recapture and other taxes, and including any interest, penalties and additions imposed with respect to such amounts; (ii) liability for the payment of any amounts of the type described in clause (i) as a result of being a member of an affiliated, consolidated, combined, unitary or aggregate group, including pursuant to Treasury Regulation section 1.1502-6 (or any predecessor or successor thereof or any analogous provision under state, local or other Applicable Law), and (iii) liability for the payment of any amounts of the type described in clause (i) or (ii) as a successor or transferee, or as a result of an express or implied obligation to indemnify any other person with respect to the payment of any amounts of the type described in clause (i) or (ii).

"Taxing Authority" or "Taxing Authorities" means any federal, state, local or foreign government, any subdivision, agency, commission or authority thereof, or any quasi-governmental body exercising any taxing authority or any other authority exercising tax regulatory authority.

"Tax Returns" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

(b)     (i) All Tax Returns required to be filed by or on behalf of Sellers or their Affiliates have been duly and timely filed with the appropriate Taxing Authority in all jurisdictions in which such Tax Returns are required to be filed (after giving effect to any valid extensions of time in which to make such filings), and all such Tax Returns are true, complete and correct in all material respects and were prepared in substantial compliance with all Applicable Laws; and (ii) except as set forth on Schedule 3.08(b)(ii), all Taxes payable by or on behalf of Sellers or their Affiliates have been fully and timely paid (whether or not shown or required to be shown on any Tax Returns).

(c)     All deficiencies asserted or assessments made as a result of any examinations by any Taxing Authority related to the Purchased Assets or the Business have been fully paid, and there are no other audits or investigations by any Taxing Authority in progress, nor has Sellers received any notice from any Taxing Authority that it intends to conduct such an audit or investigation with respect to the Purchased Assets or the Business.

(d)     Schedule 3.08(d)(i) lists (i) all types of Taxes paid, and all types of Tax Returns filed by or on behalf of Sellers, in connection with, or with respect to, the Purchased Assets or the Business and (ii) all of the jurisdictions that impose such Taxes and/or the duty to file such Tax Returns. Sellers have made available complete copies of material Tax Returns relating to the Purchased Assets or the Business relating to taxable periods that ended after December 31, 2006.

(e)     Sellers (i) have complied in all material respects with all Applicable Laws relating to the payment and withholding of Taxes with respect to the Purchased Assets or the Business; (ii) except as set forth on Schedule 3.08(e)(ii), have withheld and paid all Taxes required to have been withheld or paid in connection with any amounts paid or owing to any employees, independent contractor, creditor, stockholder or other third party and all forms required with respect thereto have been properly completed and timely filed; (iii) have duly and

14

timely withheld and paid over to the appropriate Taxing Authorities all amounts required to be so withheld and paid under all Applicable Laws; and (iv) have properly completed and timely filed all forms required with respect thereto.

(f)     None of the Sellers is a foreign person within the meaning of Section 1445 of the Code and none of the transactions undertaken pursuant to this Agreement by any Seller will give rise to any withholding obligation under any provision of Applicable Law, including Section 1445 of the Code.

(g)     No written claim has been made by a Taxing Authority in a jurisdiction in which any Sellers do not currently file Tax Returns such that such Sellers are or may be subject to taxation by that jurisdiction.

(h)     No agreement, waiver or other document or arrangement extending the period for assessment or collection of Taxes (including, but not limited to, any applicable statute of limitation) or the period for filing any Tax Returns, has been executed or filed with any Taxing Authority with respect to the Purchased Assets or the Business by or on behalf of any Sellers. No Sellers have requested any extension of time within which to file any Tax Returns with respect to the Purchased Assets or the Business, which Tax Returns have since not been filed.

(i)     There is no contract, agreement, plan or arrangement with respect to the Purchased Assets or the Business covering any person that, individually or collectively, could give rise to the payment of any amount that would not be deductible by Buyer, Sellers or any of their respective Affiliates by reason of Section 280G of the Code (determined without regard to the exceptions contained in Sections 280G(b)(4) and 280G(b)(5) or 404 of the Code).

(j)     Each of the Sellers has disclosed on its federal income Tax Returns all positions taken therein that could give rise to a substantial underpayment of federal income Tax within the meaning of Section 6662 of the Code.

(k)     There are no liens for Taxes with respect to the Purchased Assets or the Business, except for liens arising as a matter of Applicable Law relating to current Taxes not yet due.

(l)     None of the Purchased Assets are "tax-exempt use property" within the meaning of Section 168(h) of the Code or "tax-exempt bond financed property" within the meaning of Section 168(g)(5) of the Code.

(m)     No power of attorney with respect to any Tax matter is currently in force with respect to the Purchased Assets or the Business that would, in any manner, bind, obligate, or restrict Buyer.

(n)     None of the Sellers has executed or entered into any agreement with, or obtained any consents or clearances from, any Taxing Authority, or has been subject to any ruling guidance, that would be binding on Buyer for any taxable period (or portion thereof) ending after the Closing Date with respect to the Purchased Assets or the Business.

US 301674v.3

(o)     The purchase and sale of the Purchased Assets is exempt from Alabama sales and use Tax pursuant to Alabama Sales & Use Tax Regulation chapter 810-6-1-33(1) as a casual sale because the sale is a casual or isolated sale by Sellers and Sellers are not engaged in the business of selling.

   Section 3.09     Employment and Labor Matters.

(a)     Except as set forth in Schedule 3.09(a): (i) there is no, and during Sellers' operation of the Business there has not been any, labor strike, slowdown, stoppage or lockout pending, or, to the knowledge of Sellers, threatened against the Business; (ii) there is no collective bargaining or similar agreement or any arrangement with any labor organization applicable to employees of Sellers principally engaged in the Business and none are being negotiated; (iii) Sellers have not agreed to recognize any union or other collective bargaining representative, nor has any union or other collective bargaining representative been certified as an exclusive bargaining representative of any of the employees; (iv) no labor union nor representative thereof claims to or is seeking to represent Sellers' employees and to the knowledge of Sellers, no union organizational campaign or representation petition is currently pending with respect to any of the employees of Sellers; (v) the Business to Sellers' knowledge is in compliance with all Applicable Laws and regulations respecting labor, employment, immigration, fair employment practices, work place safety and health, terms and conditions of employment, and wages and hours, including tax reporting and withholding on wages; (vi) to Sellers' knowledge there are no formal grievances, complaints or charges with respect to employment or labor matters (including, without limitation, charges of employment discrimination, retaliation or unfair labor practices) related to the Business pending or, to Sellers' knowledge, threatened in any judicial, regulatory, arbitral or administrative forum; (vii) to Sellers' knowledge none of the Business' employment policies or practices is currently being audited or investigated by any federal, state or local government agency; and (viii) the Business is not subject to any consent decree, court order or settlement in respect of any labor or employment matters.

(b)     The Business has not experienced a "plant closing" or "mass layoff" (as defined in the Worker Adjustment and Retraining Act of 1988 (the "WARN Act") or any similar state, local or foreign law or regulation) affecting any site of employment of the Business or one or more facilities or operating units within any site of employment or facility of the Business, without complying with the WARN Act and any similar state, local or foreign law or regulation.

(c)     Schedule 3.09(c) sets forth the name of each full-time and part-time employee principally engaged in the Business, their respective positions, their date of hire, their annual rate of compensation (and current rate of accrual of paid time off and the level of bonus, if any, to which they may be entitled expressed as a percentage of base annual salary), and a description of their status (i.e., whether active or on leave of absence) as of the date of Schedule 3.09(c). To the extent any employee listed on Schedule 3.09(c) is on leave of absence, Schedule 3.09(c) further describes the type of leave, the date it commenced and the expected duration of leave.

16

US 301674v.3

Section 3.10    Absence of Change or Event.  Except as disclosed in Schedule 3.10, since the Reference Balance Sheet Date, Sellers have conducted the Business in all material respects in the ordinary course and have not with respect to the Business otherwise:

(a)    except for the Bankruptcy Cases, suffered an event, change, effect or development that, individually or in the aggregate, has had, or reasonably could be expected to have, a Material Adverse Effect;

(b)    mortgaged, pledged or subjected to any Encumbrance any Purchased Asset other than Permitted Encumbrances;

(c)    other than in the ordinary course of business, sold, transferred, leased to others or otherwise disposed of any of its assets (or committed to do any of the foregoing), or canceled, waived, released or otherwise compromised any material debt or claim, or any right of material value;

(d)    except for the collection of accounts receivable, instituted any litigation, action or proceeding before any court, governmental body or arbitration tribunal relating to it or its property with respect to the Business;

(e)    made or rescinded any election relating to Taxes with respect to the Purchased Assets or Business, settled or compromised any claim, action, suit, litigation, proceeding, arbitration, investigation, audit or controversy relating to Taxes with respect to the Purchased Assets or Business, or except as may be required by Applicable Law, made any change to any of its methods of reporting income or deductions for federal income tax purposes from those employed in the preparation of its most recently filed federal income Tax Returns with respect to the Purchased Assets or Business; or

(f)    increased the compensation of any employee set forth on Schedule 3.09(c), other than in the ordinary course of Sellers' business.

Section 3.11    Compliance With Law; Permits.

(a)    Except as set forth in Schedule 3.11(a), the operation of the Business has been and is in compliance in all material respects with Applicable Laws, including those relating to occupational health and safety.  The occupancies and uses of the Facilities by Sellers are in compliance in all material respects with all Applicable Laws.  Sellers have not received written notice of any violations, legal proceedings or Orders (as to which any Seller is a party or by which any Seller or any portion of a Facility is bound) relating to zoning, building use and occupancy, or fire laws or regulations against, or with respect to, the Facilities.  This Section 3.11(a) does not relate to matters with respect to (i) possession and compliance with Permits, which are the subject of Section 3.11(b), (ii) environmental matters, which are the subject of Section 3.12, and (iii) laws regarding employment and employment practices, which are the subject of Section 3.09.

(b)    Schedule 3.11(b) sets forth all Permits issued or granted to, or made by, a Seller by or to Governmental Entities that are required for the Business.  Except as disclosed in Schedule 3.11(b), Sellers have obtained all Permits that are required under all Applicable Laws,

17

US 301674v.3

including the Environmental Laws, for the operation of the Business as currently conducted or planned. Except as set forth in Schedule 3.11(b), (i) all such Permits are validly held by Sellers, and Sellers are in compliance in all material respects with all terms and conditions thereof, and (ii) during the past year, Sellers have not received notice of any violation of or proceeding relating to the revocation or modification of any such Permits.

Section 3.12   Environmental Matters.

(a)   In connection with the operation of the Business, except as set forth in Schedule 3.12(a): (i) to Sellers' knowledge, Sellers have not received any written or oral communication that alleges any material violation of, or claim under, any Environmental Law, that has not been fully and finally resolved through the appropriate judicial, administrative or other claims resolution process and that alleges any violation of, or claim under, any Environmental Law, or arising out of, based on or resulting from the presence or Release of Hazardous Materials; (ii) Sellers have been and are in compliance in all material respects with all Environmental Laws; (iii) there have been no Releases or to the knowledge of Sellers, threatened Releases of Hazardous Materials on, under, from or about the Purchased Assets as a result of Sellers' operation or use of the Purchased Assets that resulted in an Environmental Condition; (iv) no Seller has entered into or agreed to or is bound by or subject to any contract or Order relating to claims, liability under or compliance with any Environmental Law or to investigation or remediation of Hazardous Materials and (v) there is no on-site or off-site location to which any Seller or its Affiliate has transported or disposed of, or caused to be transported or disposed of, Hazardous Materials.

(b)   The term "Environmental Laws" means all requirements of Applicable Laws and Orders issued or promulgated by any Governmental Entity, relating to the environment, pollution, health, safety, natural resources, or to the management, Release or threatened Release of, or exposure to, Hazardous Materials.

(c)   The term "Environmental Condition" means soil and water contamination, or other types of Releases of Hazardous Materials or environmental damage or contamination in, on, around, under or migrating from the Purchased Assets or arising from the Purchased Assets that require investigation, remediation, or repair under Environmental Laws or any Contracts.

(d)   The term "Hazardous Materials" means all explosive or radioactive materials or substances, hazardous or toxic substances, wastes or chemicals, petroleum (including crude oil or any fraction thereof) and all other materials or chemicals regulated pursuant to any Environmental Law.

(e)   The term "Release" means any spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, leaching, emanation or migration in, into, onto, or through the environment (including ambient air, surface water, groundwater, soils, sediments of any surface water body, land surface or subsurface strata) in violation of any Environmental Laws.

US 301674v.3

Section 3.13    <u>Contracts</u>.

(a)    As of the date hereof, all of the Assigned Contracts are valid, binding and in full force and effect and are enforceable against Sellers that are a party to such Assigned Contracts and, to Sellers' knowledge, the other party thereto, in accordance with their respective terms, except as the same may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and general equitable principles regardless of whether such enforceability is considered in a proceeding at law or in equity.

(b)    Except as disclosed on <u>Schedule 3.13(b)(i)</u>, no Seller is (with or without the lapse of time or the giving of notice, or both) in breach or default in any respect under any Assigned Contract and, to the knowledge of Sellers, no other party to any Assigned Contract is (with or without the lapse of time or the giving of notice, or both) in breach or default in any respect thereunder. No Seller has received any written notice of the intention of any party to terminate any Assigned Contract. Complete and correct copies of all Assigned Contracts listed in the Schedules, together with all modifications and amendments thereto, have been made available to Buyer. The Assigned Contracts constitute all of the revenue-generating business, activities and Contracts (whether formal or informal, oral or written) relating to the Business or otherwise material to the Business. <u>Schedule 3.13(b)(ii)</u> sets forth, in respect to each storage tank under contract, the expiration date of its respective Contract.

Section 3.14    <u>Insurance</u>. The insurance policies maintained by Sellers with respect to the Business or the Purchased Assets are listed in <u>Schedule 3.14</u>. Except as set forth on <u>Schedule 3.14</u>, all such policies are in full force and effect, all premiums due and payable thereon have been paid (other than retroactive or retrospective premium adjustments that are not yet, but may be, required to be paid with respect to any period ending prior to the Closing Date under comprehensive general liability and workmen's compensation insurance policies), and no written or, to Sellers' knowledge, oral notice of cancellation or termination has been received with respect to any such policy which has not been replaced on substantially similar terms prior to the date of such cancellation. Sellers have not received any refusal of coverage for any currently active or pending claims under any policy described in <u>Schedule 3.14</u> with respect to the Business or the Purchased Assets.

Section 3.15    <u>Sellers' Knowledge</u>. The phrase "Sellers' knowledge," "to the knowledge of Sellers," and like phrases shall mean the knowledge, after due inquiry, of any of the persons listed on <u>Schedule 3.15</u>. An individual will be deemed to have knowledge of a particular fact, circumstance, event or other matter if (i) such individual has actual knowledge of such fact, circumstance, event or other matter, or (ii) such fact, circumstance, event or other matter is reflected in one or more documents written or electronic, that are or have been in such individual's possession.

Section 3.16    <u>Intellectual Property</u>. Except for those third party software license agreements listed on <u>Schedule 1.01(b)(i)</u>, there are no licenses or other rights to use (including, foreign rights) or any copyrights, patents, patent applications, trade names, trade secrets, registered and unregistered trademarks, servicemarks, franchises, domain names or other similar rights now used or employed in the Business. Sellers own or have a license to use such software,

19

a correct and complete copy of which has been provided to Buyer. To Sellers' knowledge, the use of such software does not infringe upon or violate the copy right, trade mark, service mark, patent rights, confidentiality rights or other intellectual property rights or any Person. To Sellers' knowledge, there are no claims, actions, suits or other proceeds before any Governmental Entity by any Person involving the claim of infringement or violation of any Person's intellectual property.

Section 3.17    Preferential Purchase Rights.  There are no preferential purchase rights, options or other rights in any Person (other than Sellers), to purchase or acquire any interest in the Purchased Assets, in whole or in part. Sellers hereby waive any and all such rights.

Section 3.18    Sufficiency of Assets.  On the Closing Date, except as set forth in Schedule 3.18(a) the Purchased Assets will constitute all of the assets, real and personal, tangible and intangible, that are necessary or required to permit Buyer to operate the Business in substantially the same manner as it is being conducted by Seller on the date hereof. Except as set forth in Schedule 3.18(a), the tangible Purchased Assets (including the assets held for use in the construction of the Blakeley Terminal) shall be in good working order in all material respects on the Closing Date, ordinary wear and tear excepted, and fit for their intended purpose.  Schedule 3.18(b) lists all material repairs needed, if any, at the Terminals to ensure they are in good working order.

Section 3.19    Substantial Customers.  Schedule 3.19 lists the customers of the Business whose revenue to Sellers, exceeded $10,000 for the 12-month period ending December 31, 2009 (each, a "Substantial Customer"). Except as set forth in Schedule 3.19, no Substantial Customer has indicated an intent to discontinue or substantially alter in an adverse manner its relationship (including the terms and volumes on which it obtains goods or services from Sellers). All Contracts with Substantial Customers are listed on Schedule 1.01(a)(v).

Section 3.20    Brokers or Finders.  Sellers represent, jointly and severally, as to themselves and their Affiliates, that no agent, broker, investment banker or other firm or person is or will be entitled to any broker's or finder's fee or any other commission or similar fee in connection with any of the transactions contemplated by this Agreement as a result of any actions by such party except as listed on Schedule 3.20.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Sellers, as of the date of this Agreement and as of the Closing Date, as follows:

Section 4.01    Organization, Standing and Power.  Buyer is a limited partnership duly organized, validly existing and in good standing under the laws of Delaware and has all limited partnership power and authority to carry on its business as now being conducted and to own its properties.

US 301674v.3

Section 4.02    Authority: Execution and Delivery: Enforceability.    Buyer has full limited partnership power and authority to enter into this Agreement at the Closing and to consummate the transactions contemplated hereby and thereby.    The execution, delivery and performance by Buyer of this Agreement at the Closing has been duly authorized by all requisite limited partnership action.  This Agreement has been, as of the Closing Date, duly executed and delivered by Buyer, and (assuming due execution and delivery by Sellers) this Agreement constitutes a valid and binding obligation of Buyer, enforceable in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization or similar laws affecting creditors' rights generally or by general equitable principles.

Section 4.03    No Conflicts: Consents.  The execution and delivery by Buyer of this Agreement does not, and the execution and delivery by Buyer of each Ancillary Agreement will not, and the consummation of the transactions contemplated hereby and thereby and Buyer's compliance with the terms hereof and thereof will not, conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any obligation or to loss of a benefit under, or to increased, additional, accelerated or guaranteed rights or entitlements of any person under, or result in the creation of any Encumbrance upon any of the properties or assets of Buyer under, any provision of (i) the limited partnership agreement, certificate of limited partnership, or other organizational documents of Buyer, (ii) any Contract material to the ability of Buyer to consummate the transactions contemplated hereby or by the Ancillary Agreements, to which Buyer is a party or by which any of its properties or assets is bound or (iii) any Order or Applicable Law applicable to Buyer or its properties or assets.  No Consent is required to be obtained or made by Buyer in connection with the execution, delivery and performance of this Agreement or any Ancillary Agreement or the consummation of the transactions contemplated hereby and thereby, other than (i) those set forth on Schedule 4.03, and (ii) those that may be required by reason of the terms or nature of the Purchased Assets or the participation of Sellers (as opposed to those required solely by reason of the participation by Buyer) in the transactions contemplated hereby and by the Ancillary Agreements.

Section 4.04    No Litigation.  As of the date hereof, there is not nor has been commenced or, to the knowledge of Buyer, threatened by any third party against Buyer or any of its principals, officers, directors or Affiliates, any proceeding (a) involving any challenge to, or seeking damages or other relief in connection with, the transactions contemplated by this Agreement and the other Ancillary Agreements, or (b) that may reasonably be expected to have the effect of preventing, delaying, making illegal, or otherwise interfering with the transactions contemplated by this Agreement and the other Ancillary Agreements.

Section 4.05    Brokers or Finders.  Buyer represents as to itself and its Affiliates that no agent, broker, investment banker or other firm or person is or will be entitled to any broker's or finder's fee or any other commission or similar fee in connection with any of the transactions contemplated by this Agreement as a result of any actions by such party.

US 301674v.3

ARTICLE V

COVENANTS RELATING TO CONDUCT OF BUSINESS

Section 5.01    Covenants of Sellers Relating to Conduct of Business.

(a) From the date hereof through the Closing Date, and to the extent not inconsistent with the Bankruptcy Code, the operation and information reporting requirements of the Office of the United States Trustee for the Southern District of Alabama, and subject to any Order or direction of the Bankruptcy Court, Sellers agree to:

(i)    except as contemplated by this Agreement or with written consent of Buyer, operate the Business and maintain the Purchased Assets in a good and workmanlike manner and in the ordinary course of business;

(ii)    preserve the business organization of the Business intact and use commercially reasonable and good faith efforts to keep available to Buyer the services of the present officers and employees of the Business and to preserve the good will of the suppliers, landlords and vendors having business relations with the Business;

(iii)    maintain in force the insurance policies referred to in Schedule 3.14 or insurance policies providing the same or substantially similar coverage, and notify Buyer prior to the expiration of any of such insurance policies.

(iv)    comply in all material respects with all Applicable Laws;

(v)    perform and comply in all material respects with all of the material covenants and conditions contained in Contracts relating to the Business and the Purchased Assets;

(vi)    pay all costs and expenses of the Business (including accounts payable) only in accordance with Buyer's prior written approval, which such approval shall not be unreasonably withheld, conditioned or delayed;

(vii)    properly complete and file all Tax Returns, pay all Taxes and assessments with respect to the Business and the Purchased Assets that become due or payable prior to the Closing Date; and

(viii)    advise Buyer on all material matters relating to the Purchased Assets and the Business, including, without limitation, all proposed authorizations for expenditures in excess of $10,000.

(b) From the date hereof through the Closing Date, and to the extent not inconsistent with the Bankruptcy Code, the operation and information reporting requirements of the Office of the United States Trustee for the Southern District of Alabama, and subject to any Order or direction of the Bankruptcy Court, Sellers will not without Buyer's written authorization:

22

US 301674v.3

(i)     declare or pay dividends or make any other distributions in respect of their capital stock or partnership interests, or purchase, redeem or otherwise acquire or retire for value any shares of capital stock or partnership interests;

(ii)     except as set forth on the Reference Balance Sheet, create or settle intercompany payables or receivables;

(iii)     collect prepaid expenses or unearned revenue;

(iv)     settle any litigation, action or claim other than settlements settled through insurance proceeds;

(v)     terminate, amend or fail to renew any material Permit other than in the ordinary course of business;

(vi)     subject to Section 5.01(a)(vi), delay or postpone the payment of any accounts payable or commissions or any other liability or obligation or agree or negotiate with any party to extend the payment date of any accounts payable or commissions or any other liability or obligation or accelerate the collection of (or discounted) any accounts or notes receivable;

(vii)     take any action or fail to take any action that would reasonably be expected to have the effect of accelerating to the pre-Closing periods sales to customers or collections of receivables from customers or other revenues that would otherwise be expected to take place or be incurred after the Closing; or

(viii)     permit or allow any of the Purchased Assets (tangible or intangible) to be subject to any Encumbrance, other than Permitted Encumbrances;

(ix)     sell, transfer or otherwise dispose of any of the Purchased Assets;

(x)     voluntarily permit any material right with respect to the Purchased Assets or Business to expire, or waive or release any material right with respect to the Purchased Assets or the Business;

(xi)     enter into any new material agreements or contracts with respect to the Purchased Assets or the Business that cannot be cancelled within thirty (30) days, or any new, or extensions or renewals of any existing, Petroleum and Other Product storage contracts;

(xii)     make any single commitment in excess of $5,000 for any purpose, except as required for emergency operations or protection of the environment;

(xiii)     enter into any Related Party Transactions (provided that Buyer's authorization shall not be unreasonably withheld, conditioned or delayed with respect to any Related Party Transaction conducted in the ordinary course of business);

(xiv)     make any payment of interest, fees or otherwise to any lender;

23

US 301674v.3

(xv)   market or publish terms of Terminals' capacity or other services of the Business;

(xvi)   make or rescind any election relating to Taxes, settle or compromise any claim, action, suit, litigation, proceeding, arbitration, investigation, audit or controversy relating to Taxes, or except as may be required by Applicable Law or GAAP, make any material change to any of its methods of accounting or methods of reporting income or deductions for Tax or accounting practice or policy from those employed in the preparation of its most recent Tax Returns, with respect to the Purchased Assets or Business;

(xvii)   increase the compensation payable, or pay any compensation out of the ordinary course, to any employees;

(xviii)   not file any motion with the Bankruptcy Court regarding the transactions contemplated hereby which has not been previously been approved by Buyer (provided that Buyer's authorization or approval shall not be unreasonably withheld, conditioned or delayed except with respect to motions that alter Buyer's position as Stalking Horse Buyer); or

(xix)   agree to take any of the actions described above.

Section 5.02   Access to Information. Sellers shall afford to Buyer and its accountants, counsel, environmental consultants and other representatives of any of the foregoing (such entities and representatives other than Buyer being referred to as "Buyer's Representatives") reasonable and timely access in a manner that does not unreasonably interfere with the normal operations of the Business, during the period prior to the Closing, to all the employees, managers, properties, books, Contracts, commitments, information systems, Tax returns and Records of the Business, and, during such period shall furnish reasonably promptly to Buyer and Buyer's Representatives any information (including, with respect to environmental matters, all relevant records, audits, assessments, field notes, monitoring well data and other documents or information in possession of Sellers) concerning the Business, the Purchased Assets or the Assumed Liabilities as Buyer (or any Buyer's Representative) may reasonably request. Buyer shall permit Sellers to duplicate, at Sellers' expense, the Assigned Records.

Section 5.03   Confidentiality.

(a)   Buyer acknowledges that the information being provided to it in connection with the transactions contemplated hereby is subject to the terms of the Confidentiality Agreement, the terms of which are incorporated herein by reference. Effective upon the Closing, the Confidentiality Agreement shall terminate.

(b)   Sellers shall keep confidential, and use reasonable efforts to cause their Affiliates and each of their respective officers, managers, directors, employees and advisors (collectively, "Seller Parties") to keep confidential, after the Closing all information relating to the Business, the Purchased Assets or the Assumed Liabilities (all such information being "Confidential Information"), except, (i) to the extent applicable in connection with the procedures set forth in subsection (c) below, (ii) as necessary to defend or prosecute any

24

US 301674v.3

litigation or dispute (subject to subsection (c) below), or (iii) for information that is publicly available on the Closing Date, or thereafter becomes publicly available other than as a result of a breach of this Section 5.03 or of the Confidentiality Agreement.

(c)     In the event Seller Parties are requested or required by Applicable Law, including any stock exchange rule, governmental order, judicial process or similar means (including by oral questions, interrogatories, requests for information or documents in legal proceedings, subpoena, civil investigative demand or other similar process) to disclose Confidential Information of the other, such Person shall provide Buyer with prompt written notice of any such request or requirement so that Buyer may seek a protective order or other appropriate remedy (including reasonable consultation with respect to taking steps to resist or narrow the scope of such request or requirement) or waive compliance (in whole or part) with the provisions of this Section 5.03. If Buyer waives compliance with the provisions of this Section 5.03 with respect to a specific request or requirement, disclosure shall nonetheless be limited to only that portion of the Confidential Information that is covered by such waiver and which is necessary to be disclosed in order to comply with such request or requirement. If, in the absence of a protective order or other remedy or a waiver by Buyer, disclosure is nonetheless, in the written opinion of counsel, legally compelled or else would result in liability for contempt or other censure or penalty, disclosure may, without liability hereunder, be made of only that portion of the Confidential Information which such counsel advises is legally required to be disclosed.

(d)     The covenants set forth in this Section 5.03 shall terminate two years after the Closing Date; provided, that the Parties agree that the Sellers Parties shall only be obligated to comply with this Section 5.03 to the extent not inconsistent with the Bankruptcy Code, the operation and information reporting requirements of the Office of the United States Trustee for the Southern District of Alabama, and any Order or direction of the Bankruptcy Court.

Section 5.04     Commercially Reasonable and Good Faith Efforts. Each party shall use its commercially reasonable and good faith efforts to take or cause to be taken all actions or do or cause to be done all things necessary, proper or advisable to fulfill the conditions to the Closing hereunder and to cause the Closing to occur as soon as practicable, including taking all actions necessary to comply promptly with all legal requirements that may be imposed on it or any of its Affiliates with respect to the Closing and to cause all other conditions to be satisfied, including with respect to the Assigned Contracts and Assigned Permits. Each of the parties hereto will furnish to the other party hereto such necessary information and reasonable assistance as such other party may reasonably request in connection with its preparation of necessary filings or submissions to any Governmental Entity. Buyer shall be entitled to contact any of the counterparties to the Assigned Contracts and Assigned Permits to facilitate the assignment thereof. For the avoidance of doubt, nothing in this Section 5.04 shall require a Party to waive any condition to the Closing set forth in Article VI.

Section 5.05     Expenses: Apportionment of Taxes.

(a)     Whether or not the Closing takes place, and except as otherwise specified in this Agreement, all costs and expenses incurred in connection with this Agreement and the

25

Ancillary Agreements and the transactions contemplated hereby and thereby shall be paid by the party incurring such expense.

(b)     If the Closing occurs:

(i)     All Transfer Taxes applicable to, or incurred in connection with, the conveyance and transfer from Sellers to Buyer of the Purchased Assets and any filing or recording fees applicable to such conveyance and transfer shall be paid by Sellers. The parties shall use reasonable efforts to avail any available exemptions from any such Transfer Taxes or fees, and to cooperate with the other party in providing any information and documentation that may be necessary to obtain such exemptions.

(ii)     Ad valorem taxes with respect to the Purchased Assets shall be prorated on a daily basis over the property tax year of January 1st through December 31st as of the Closing Date with Sellers responsible for the period prior to and including the Closing Date and Buyer responsible for the period beginning the day after the Closing Date. Sellers, collectively on the one hand, and Buyer, on the other hand, shall each pay their respective pro rata portion of ad valorem taxes with respect to any property or lease included in the Purchased Assets (other than ad valorem taxes included within rental payments under a lease, if any). To the extent the ad valorem taxes for the period that includes the Closing Date are not finally determined prior to the Closing, such ad valorem taxes shall be estimated for purposes of the Closing using the best available information for such period (or the prior period property taxes in the event there is not any available information for such period), and Sellers shall pay to Buyer an amount equal to Sellers' share of such estimated ad valorem taxes at the Closing. Upon receipt of the tax bills for the period that includes the Closing Date, the Buyer shall determine the proration of the ad valorem taxes and issue Sellers either an invoice for any additional amount that is due from Sellers' or a check for the amount of any overpayment by Sellers. Sellers shall pay to Buyer their prorated portion of the ad valorem taxes within thirty (30) days after receipt of Buyer's invoice therefore and copies of the ad valorem tax bills from the taxing units. Buyer shall pay the ad valorem taxes to the relevant taxing units when due, and prior to such taxes becoming delinquent.

Section 5.06     Employee Matters.    Sellers shall retain (i) sole sponsorship of, and exclusive responsibility for all liabilities and obligations under, arising out of, or relating to, each Seller Plan, and (ii) sole responsibility for all liabilities and obligations under, arising out of, or relating to, the employment or termination of employment of each employee of Sellers and their Affiliates in connection with the transactions contemplated by this Agreement. Buyer shall be permitted, in its discretion, to offer employment to employees of Sellers and their Affiliates that are employed, in whole or in part, in connection with the Business.

Section 5.07     Post-Closing Cooperation.

(a)     Buyer and Sellers shall cooperate with each other, and shall cause their officers, employees, agents, auditors and representatives to cooperate with each other after the Closing to ensure the orderly transition of the Business from Sellers to Buyer. Upon the reasonable written request of Buyer, after the Closing, Sellers shall assist, in obtaining consents,

26

US 301674v.3

any transfers or successions of interest from third parties (including any applicable Governmental Entity) that are necessary or appropriate to transfer any portion of the Purchased Assets to Buyer. After the Closing, upon reasonable written notice, Buyer and Sellers shall furnish or cause to be furnished to each other and their employees, counsel, auditors and representatives access (including the ability to make copies), during normal business hours, to such information and assistance relating to the Business (to the extent within the control of such party or any of its Affiliates) as is contained in any Record constituting an Excluded Asset, or is reasonably necessary for (i) financial reporting, Tax and accounting matters and (ii) defense or prosecution of litigation and disputes (other than litigation and disputes under this Agreement).

(b)     After the Closing, upon reasonable written notice, Buyer and Sellers shall furnish or cause to be furnished to each other, as promptly as practicable, such information and assistance (to the extent within the control of such party) relating to the Purchased Assets (including, access to books and records) as is reasonably necessary for compliance with accounting and reporting requirements, filing of all Tax returns, and making of any election related to Taxes with respect to the Purchased Assets, the preparation for any audit by any Taxing Authority, and the prosecution or defense of any claim, suit or proceeding related to any Tax return with respect to the Purchased Assets. Sellers and Buyer shall cooperate with each other in the conduct of any audit or other proceeding relating to Taxes involving the Business. In the event that Sellers or Buyer shall after the Closing take any position in any Tax return, or reach any settlement or agreement relating to Taxes on audit, which is in any manner inconsistent with any position taken by any Seller in any Tax filing, settlement or agreement made by any Seller prior to the Closing with respect to the Purchased Assets and such inconsistent position (i) might require the payment by Buyer or Sellers of more Tax than would have been required to be paid had such position not been taken or such settlement or agreement not been reached, (ii) affects the determination of useful life, basis or method of depreciation, amortization or accounting of any of the Purchased Assets or any of the properties, assets or rights of Buyer or (iii) might accelerate the time at which any Tax must be paid by Buyer or Sellers with respect to the Purchased Assets, then Buyer or Sellers, as the case may be, shall provide timely and reasonable notice to the other party hereto of such position.

(c)     Buyer and Sellers will retain all Records and other documents pertaining to the Business in existence on the Closing Date for a period of three years following the Closing. No such Records or other documents shall be destroyed or disposed of by any retaining party at any time prior thereto without first advising the other party in writing and giving such party a reasonable opportunity to obtain possession thereof for the purposes permitted by this Section 5.07.

(d)     Each Party shall reimburse the other for reasonable out-of-pocket costs and expenses incurred in assisting the other pursuant to this Section 5.07. No Party shall be required by this Section 5.07 to take any action that would unreasonably interfere with the conduct of its business or unreasonably disrupt its normal operations (or, in the case of Buyer, the Business). Any information relating to the Business received by Sellers pursuant to this Section 5.07 shall be subject to Section 5.03.

Section 5.08     Publicity. Prior to the Voluntary Petition filing, no public release or announcement concerning the transactions contemplated hereby shall be issued by any Seller

27

without the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned or delayed), except as such release or announcement may be required by law or the rules or regulations of any United States or foreign securities exchange, in which case Sellers shall allow Buyer reasonable time to comment on such release or announcement in advance of such issuance.

Section 5.09    Insurance. Sellers shall maintain their current insurance coverage under each insurance policy maintained by Sellers with respect to the Business or covering any Purchased Asset until the Closing. Buyer acknowledges that after the Closing Sellers shall have no responsibility for obtaining or maintaining any insurance (including any performance bonds) relating to the Business, whether relating to or arising out of occurrences prior to, at or subsequent to the Closing.

Section 5.10    Non-Competition.

(a)    Materiality. Buyer and Sellers hereby agree that the covenants set forth in this Section 5.10 are a material and substantial part of the transactions contemplated by this Agreement, and that a portion of the Purchase Price shall be paid for and allocated to the covenants set forth in this Section 5.10.

(b)    Prohibited Activities. For a period of two (2) years after the Closing Date, Sellers agree that they will not, and they will cause their officers, subsidiaries and Affiliates not to, anywhere within the State of Alabama, except in accordance with Buyer's prior written consent, directly or indirectly, own, acquire, finance, construct or assist in the operation of any facility or asset for the storage (short-term or long-term) of Petroleum and Other Products within the State of Alabama (the "Prohibited Activities"). Nothing herein shall prevent, restrict or otherwise limit ownership interests by Sellers of five percent (5%) or less in any publicly traded company on any securities exchange.

(c)    Remedies. Sellers acknowledge that (i) the provisions of this Section 5.10 are reasonable and necessary to protect the legitimate interests of Buyer and its Affiliates, (ii) any violation of this Section 5.10 will result in irreparable injury to Buyer and its Affiliates and that damages at law would not be reasonable or adequate compensation to Buyer and its Affiliates for a violation of this Section 5.10, and (iii) Buyer and its Affiliates shall be entitled to have the provisions of this Section 5.10 specifically enforced by preliminary and permanent injunctive relief without the necessity of proving actual damages and without posting bond or other security as well as to an equitable accounting of all earnings, profits and other benefits arising out of any violation of this Section 5.10, including, without limitation, estimated future earnings lost as a result of a violation of this Section 5.10. In the event that the provisions of this Section 5.10 should ever be deemed to exceed the time, geographic, product or any other limitations permitted by Applicable Law, then such provisions shall be deemed reformed to the maximum extent permitted by Applicable Law.

Section 5.11    As-Built Surveys. Sellers shall, as promptly as practicable following execution of this Agreement, provide to Buyer at Sellers' cost as-built surveys, in respect of each of the Facilities, made in accordance with the 2005 Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys, which shall be certified to Buyer and to the Title Company;

US 301674v.3

stamped and sealed by a professional surveyor licensed in the State of Alabama, and shall accurately delineate the location of all flood zones (i) as determined by the Federal Emergency Management Agency and (ii) contain such surveyor's statement confirming that the developed portion of the land containing the Facilities are located above the elevation of the 100-year flood zone (as determined by the Federal Emergency Management Agency) (the "As-Built Surveys").

Section 5.12    Title Insurance.   Promptly following execution of this Agreement, Sellers shall cause Fidelity National Title (the "Title Company") to furnish Buyer and its counsel a current owner's ALTA title policy commitment describing and covering the Facilities, listing Buyer as the prospective named insured, showing title to the respective Facilities in the respective Seller and committing to issue an Owner's ALTA Title Insurance Policy underwritten by a title insurance company or companies acceptable to Buyer in the amount of the value of the land and improvements located thereon.   Sellers agree to deliver such affidavits, certificates, value declarations, transfer tax and similar documents reasonably required by the Title Company to issue a Title Policy, and such other documents customarily required by the Title Company or public taxing or filing authorities for real estate transactions in each respective jurisdiction. Sellers shall be responsible for the costs (including premium) associated with the Title Policy.

Section 5.13    Removal of Property.  Upon request of Buyer, Sellers shall remove any items other than the Purchased Assets from the Facilities at Sellers' sole expense.

Section 5.14    Tank Gauging and Sampling.  On the Closing Date, Sellers shall cause tank gauging and sampling procedures ("Tank Gauging and Sampling") to be conducted by an independent inspection service agreed to by Buyer and Sellers in conformance with the latest A.P.I. Standards for the tanks to be measured.   The independent inspection service will determine net volumes, corrected to standard temperature and density (API Gravity) for each tank as well as determining unsaleable bottoms, sediment and water ("BS&W").  Composite samples shall be taken from each tank and retained for a period of 90 days by the independent inspection service.  Sellers and Buyer may each have a representative present during gauging. The volumes determined by the inspection service will constitute the accurate volumes of all products and BS&W at the terminal unless otherwise agreed by the Buyer and Sellers (the "Closing Date Tank Volume").  Sellers and Buyer will share equally in the cost of the independent inspection service.

Section 5.15    Appointment of Interim Managers

. Upon the filing of the Voluntary Petitions, Sellers shall (i) appoint Gulf Atlantic Capital Corporation, subject to the approval of the Bankruptcy Court, as an interim restructuring advisor to Sellers and (ii) to appoint, subject to the approval of the Bankruptcy Court and the Buyer, until the consummation of a sale of the Purchased Assets pursuant to a final Sale Order, an independent interim operations manager of the Terminals selected from a list of three or more independent operations managers mutually agreeable to Seller and Buyer.

29

# ARTICLE VI

## CONDITIONS PRECEDENT

**Section 6.01**     Conditions to Each Party's Obligation To Effect The Closing. The respective obligation of each Party to effect and complete the Closing is subject to the satisfaction or waiver on or prior to the Closing of the following conditions:

(a)     Governmental Approvals.     All authorizations, consents, orders or approvals of, or declarations or filings with, or expirations of waiting periods imposed by, any Governmental Entity listed on Schedule 6.01(a) shall have been obtained or filed.

(b)     No Injunctions or Restraints. No temporary restraining order, preliminary or permanent injunction or other order issued by any Governmental Entity or other legal restraint or prohibition preventing the consummation of the transactions contemplated by this Agreement or by the Ancillary Agreements shall be in effect; provided, however, that Buyer and Sellers shall have used their commercially reasonable efforts to prevent the entry of any such injunction or other order and to appeal as promptly as possible any such injunction or other order that may be entered.

**Section 6.02**     Conditions to Obligations of Buyer. The obligations of Buyer to effect and complete the Closing are further subject to the following conditions:

(a)     Performance of Obligations of Sellers.     Sellers shall have performed and complied with all of their undertakings and agreements required by this Agreement to be performed or complied with by them prior to or at the Closing.

(b)     Representations and Warranties.     The representations and warranties of Sellers made hereunder shall be true and correct in all respects at and as of the Closing Date, with the same force and effect as though made at and as of the Closing Date, except to the extent that any representation or warranty is made as of a specified date, in which case such representation or warranty shall be true and correct as of such date.

(c)     Loan Purchase. The closing of the Loan Purchase as contemplated under that certain Sale and Assignment Agreement between Regions Bank and Buyer shall have occurred.

(d)     Seller Certificate. Buyer shall have been furnished with a certificate of an authorized officer of each Seller, dated the Closing Date, certifying that the conditions contained in Sections 6.02(a) and 6.02(b) have been fulfilled.

(e)     Title Insurance. Sellers shall have delivered to Buyer, an Owner's ALTA Title Insurance Policy (the "Title Policy"), reasonably satisfactory to Buyer, issued by the Title Company which shall insure good and marketable fee simple title and leasehold title, as applicable, in Buyer to the Owned Real Property and Leased Real Property, in the amount of the value of the land and improvements located thereon, and shall provide for extended coverage over the general exceptions normally contained therein and specifically shall delete (to the full extent allowed by Applicable Law) any general survey exception. The Title Policy shall provide

30

(by way of affirmative endorsements) (i) that the Facilities have an unencumbered, and except as specifically stated in Section 3.07(b), unobstructed right of access to a public road, (ii) that the Facilities are in compliance with all zoning laws, regulations and ordinances, (iii) that the Facilities are in compliance with all deed restrictions and restrictive covenants, (iv) that the parcel of land for each Facility is contiguous and (v) such other coverage or endorsements as may reasonably be required by Buyer, subject only to (x) Permitted Encumbrances and (y) such additional standard printed exceptions (other than general exceptions as are to be deleted or insured against as provided herein) customarily contained in such form of owner's ALTA title insurance policy. Sellers agree to deliver such affidavits, certificates, value declarations, transfer tax and similar documents reasonably required by the Title Company to issue a Title Policy, and such other documents customarily required by the Title Company or public taxing or filing authorities for real estate transactions in each respective jurisdiction. The Title Policy shall clearly indicate which Permitted Encumbrances pertain to which parcel or tract of land at each Facility.

(f)     Absence of Material Adverse Effect. Except for the Bankruptcy Cases, since the Reference Balance Sheet Date, there shall not have been any occurrence or change relating to the Business or the Purchased Assets that has had or could reasonably be expected to have a Material Adverse Effect.

(g)     Consents and Approvals. All consents, approvals and authorizations of any Persons, and all filings with and notifications of any Persons (including any entities which regulate the Business, Sellers or Buyer) listed on Schedule 6.02(g), shall have been obtained, effected or waived.

(h)     Blakeley Construction Process.     To Sellers' knowledge, all materials which have been ordered or purchased and invoiced for use in the construction of the Blakeley Terminal shall be on-site on the Real Property.

(i)     Due Diligence. Buyer shall have completed, to its satisfaction in its sole discretion, its diligence on the Purchases Assets (including title, contracts, customer relationships and operational issues).

(j)     Delivery of Certain Financial Information.     Sellers have delivered to Buyer financial statements reasonably satisfactory to Buyer.

(k)     Delivery of Records.     Sellers shall have delivered true and complete copies of the Assigned Records to Buyer.

(l)     Condition of Storage Tanks. Storage tanks located at the Facilities shall be clean and in good working order and Sellers shall have delivered an itinerary of all future scheduled deliveries and shipping satisfactory to Buyer. The Tank Gauging and Sampling shall have been conducted and the results thereof shall be satisfactory to Buyer.

(m)     Tax Arrangements. Sellers shall use commercial best efforts to assign to Buyer and be effective all tax abatement, tax holiday and similar agreements and arrangements, related to the GO Zone or otherwise.

31

(n)     Bankruptcy Court Approval. The Sale Order (a) shall have been entered by the Bankruptcy Court in form and substance reasonably acceptable to Buyer and not inconsistent with the terms of this Agreement (i) approving the transactions contemplated hereby and the terms and conditions of this Agreement, and (ii) finding that notice of the hearing concerning approval of the transactions contemplated hereunder was given in accordance with the Bankruptcy Code and constitutes such notice as is appropriate under the particular circumstances, and (iii) finding that Buyer is a "good faith" purchaser entitled to the protections afforded by Section 363(m) of the Bankruptcy Code, and (b) shall have become a final and nonappealable order.

(o)     Other Documents. Sellers shall have furnished to Buyer the documents referred to in Section 2.02(a).

Section 6.03     Conditions to Obligation of Sellers. The obligation of Sellers to effect and complete the Closing is further subject to the following conditions:

(a)     Representations and Warranties. The representations and warranties of Buyer made hereunder shall be true and correct in all respects at and as of the Closing Date, with the same force and effect as though made at and as of the Closing Date, except for changes permitted or contemplated by this Agreement and except to the extent that any representation or warranty is made as of a specified date, in which case such representation or warranty shall be true and correct in all respects as of such date.

(b)     Performance of Obligations of Buyer. Buyer shall have performed and complied with all of its undertakings and agreements required by this Agreement to be performed or complied with by it prior to or at the Closing.

(c)     Buyer Certificate. Sellers shall have been furnished with a certificate of an authorized officer of Buyer, dated the Closing Date, certifying that the conditions contained in Sections 6.03(a) and 6.03(b) have been fulfilled.

(d)     Consents and Approvals. All consents, approvals and authorizations of any Persons, and all filings with and notifications of any Persons listed on Schedule 6.03(d), shall have been obtained, effected or waived.

(e)     Bankruptcy Court Approval. The Sale Order (a) shall have been entered by the Bankruptcy Court in form and substance reasonably acceptable to Seller and not inconsistent with the terms of this Agreement (i) approving the transactions contemplated hereby and the terms and conditions of this Agreement, and (ii) finding that notice of the hearing concerning approval of the transactions contemplated hereunder was given in accordance with the Bankruptcy Code and constitutes such notice as is appropriate under the particular circumstances, and (iii) finding that Buyer is a "good faith" purchaser entitled to the protections afforded by Section 363(m) of the Bankruptcy Code, and (b) shall have become a final order.

(f)     Other Documents. Buyer shall have furnished to Sellers the documents referred to in Section 2.02(b).

32

## ARTICLE VII

### INDEMNIFICATION

Section 7.01    Indemnification by Sellers.    Sellers agree to, jointly and severally, defend, indemnify and hold harmless Buyer, its Affiliates and their respective officers, managers, stockholders, directors, members, partners, employees, agents and representatives (individually, a "Buyer Indemnitee", and, collectively, the "Buyer Indemnitees"), against and in respect of any and all actions, suits, proceedings, losses, damages, claims, liabilities, demands, assessments, Orders, costs and expenses, including reasonable attorneys' fees ("Damages") to the extent arising out of any (i) breaches of any representation or warranty hereunder on the part of a Seller, (ii) failures by a Seller to perform or otherwise fulfill any covenant, undertaking or agreement or obligation hereunder or under any documents delivered hereunder or (iii) the Excluded Liabilities.

Section 7.02    Indemnification by Buyer. Buyer agrees to indemnify and hold harmless Sellers, their Affiliates and their respective officers, directors, stockholders, managers, members, partners, employees, agents and representatives (individually, a "Seller Indemnitee", and, collectively, the "Seller Indemnitees"), against and in respect of any and all Damages to the extent arising out of any (i) breaches of any representation or warranty hereunder on the part of Buyer, (ii) failures by Buyer to perform or otherwise fulfill any covenant, undertaking or agreement or obligation hereunder or under any documents delivered hereunder or (iii) the Assumed Liabilities.

Section 7.03    Indemnification Procedure.    If any indemnified Person discovers or otherwise becomes aware of an indemnification claim arising under this Agreement, such indemnified Person will give written notice to the indemnifying Party, specifying such claim, and may thereafter exercise any remedies available to such indemnified Person under this Agreement; provided, however, the failure of any indemnified Person to give notice as provided herein will not relieve the indemnifying Party of any obligations hereunder, to the extent the indemnifying Party is not materially prejudiced thereby. Further, promptly after receipt by an indemnified Person hereunder of written notice of the commencement of any action or proceeding with respect to which a claim for indemnification may be made against any indemnifying Party, the indemnified Person will give written notice to the indemnifying Party of the commencement of such action; provided, however, the failure of any indemnified Person to give notice as provided herein will not relieve the indemnifying Party of any obligations hereunder, to the extent the indemnifying Party is not materially prejudiced thereby. If any claim is brought against an indemnified Person, the indemnifying Party will be entitled to participate in and to assume the defense thereof to the extent that it may wish, with counsel reasonably satisfactory to such indemnified Person, and after notice from the indemnifying Party to such indemnified Person of the indemnifying Party's election to assume the defense thereof, the indemnifying Party shall not be liable to such indemnified Person for any legal or other expenses subsequently incurred by the latter in connection with the defense thereof unless the indemnifying Party has failed to assume the defense of such claim and to employ counsel reasonably satisfactory to such indemnified Person. Notwithstanding any of the foregoing to the contrary, the indemnified Person will be entitled to select its own counsel and assume the defense of any action brought against it if the indemnifying Party fails to select counsel

33

reasonably satisfactory to the indemnified Person or fails to assume the defense of the claim, the expenses of such defense to be paid by the indemnifying Party. The indemnified Person will in good faith cooperate with and assist the indemnifying Party in the prosecution or defense of such indemnified claim at no expense to the indemnified Person. No indemnifying Party shall consent to entry of any judgment or enter into any settlement with respect to a claim either (a) without the consent of the indemnified Person, which consent shall not be unreasonably withheld, conditioned or delayed, or (b) unless such judgment or settlement includes as an unconditional term thereof the giving by the claimant or plaintiff to such indemnified Person of a release from all liability with respect to such claim. No indemnified Person shall consent to entry of any judgment or enter into any settlement of any such action, the defense of which has been assumed by an indemnifying Party, without the consent of such indemnifying Party, which consent shall not be unreasonably withheld.

Section 7.04    Certain Limitations. The liability of Sellers, on the one hand, or Buyer, on the other hand, as applicable, for claims under this Agreement shall be limited by the following:

(a)    Recovery by any Buyer Indemnitees or Seller Indemnitees shall in no event include any special, indirect, incidental, exemplary, punitive or consequential damages (including lost profits or lost revenues) whatsoever (except to the extent a Buyer Indemnitee or a Seller Indemnitee is liable for such damages to any other Person).

(b)    Notwithstanding anything to the contrary contained in Section 7.01, Section 7.02 or otherwise, after the expiration of the representations and warranties as described in Section 7.05, neither Sellers nor Buyer shall have any further obligations under Section 7.01(i) and Section 7.02(i), except for claims for Damages in respect of which an indemnified Party has given to the indemnifying Party written notice prior to such date.

(c)    Survival. Notwithstanding anything herein to the contrary, this Article VII shall survive termination of this Agreement without limitation.

(d)    Sole Remedy. The provisions of this Article VII shall provide the sole and exclusive remedy with respect to any and all Damages arising from the matters referred to in Section 7.01 or 7.02, as the case may be, or otherwise under or in connection with the Purchased Assets, the Business, this Agreement or the transactions contemplated hereby. Nothing in this Section 7.04(d) shall limit or restrict the ability or right of any party hereto to seek injunctive or other equitable relief for any breach or alleged breach of this Agreement or any provision hereof.

Section 7.05    Survival of Representations and Warranties. The representations and warranties contained in this Agreement shall survive the Closing solely for purposes of Article VII and shall terminate at the close of business on the two year anniversary of the Closing Date, except for (x) the representations and warranties contained in Section 3.08 and Section 3.09, which shall survive until 60 days after the expiration of the applicable statute of limitations (giving effect to extensions thereof), and (y) the representations and warranties set forth in Sections 3.01, 3.02, 3.03, which shall survive the Closing Date indefinitely.

34

US 301674v.3

Section 7.06    Tax Treatment of Indemnity Payments. Sellers and Buyer agree to treat any indemnity payment made pursuant to this Article VII as an adjustment to the Purchase Price for all Tax purposes. If, notwithstanding the treatment required by the preceding sentence, any indemnification payment is determined to be taxable to the party receiving such payment by any Taxing Authority, the paying party shall also indemnify the party receiving such payment for any Taxes incurred by reason of the receipt of such payment and any expenses incurred by the party receiving such payment in connection with such Taxes (or any asserted deficiency, claim, demand, action, suit, proceeding, judgment or assessment, including the defense or settlement thereof, relating to such Taxes).

Section 7.07    Release of Claims and Indemnification.

(a)    For good and valuable consideration, the receipt and sufficiency of which each Seller (each, a "Releasing Party") expressly acknowledges, each Releasing Party hereby RELEASES, ACQUITS, AND FOREVER DISCHARGES each of (i) the Sellers and (ii) Buyer and its Affiliates (each of the foregoing, a "Released Party") from any and all Claims of whatsoever kind or nature that such Releasing Party might have because of anything done, omitted, suffered, or allowed to be done by any of the Released Parties on or before the date hereof, WHETHER HERETOFORE OR HEREAFTER ACCRUING, WHETHER FORESEEN OR UNFORESEEN, OR WHETHER KNOWN OR UNKNOWN TO THE PARTIES (the "Released Matters"). Each of the Releasing Parties further agrees, and agrees to cause its respective Affiliates, never to commence, benefit from or accept any Damages arising from any legal action or other proceeding based in whole or in part upon the foregoing Released Matters and will reimburse each Released Party hereto for any and all costs, judgments, liabilities, expenses and fees (including any and all reasonable attorneys' fees) that such Released Party may incur in connection with any such legal action or other proceeding. The parties to this Section 7.07 agree that this release is an essential and material term of this Agreement. Each such party has consulted with legal counsel before signing this Agreement and executes this Agreement voluntarily, with the intention of fully and finally extinguishing all of the Released Matters. For purposes of this Section 7.07, "Claims" means all theories of recovery of whatever nature, whether known or unknown, now or hereafter recognized by the law or equity of any jurisdiction, including any and all causes of action, charges, indebtedness, losses, claims, liabilities, demands, obligations, promises, agreements, controversies, actions, rights, costs, compensation, expenses and Damages, whether arising in equity or under the common law or under any contract or statute.

(b)    In connection with the release set forth in Section 7.07(a) above, each Releasing Party hereby agrees to defend, indemnify and hold harmless each of the Released Parties from and against any and all Claims arising under or encompassed by the Released Matters that are asserted against such other party by or on behalf of it after the Effective Date.

Section 7.08    Cooperation. Sellers shall extend reasonable cooperation to Buyer in connection with Buyer's defense of any third-party claims related to the Purchased Assets or the Business and, in connection therewith, shall furnish such records, information, and testimony and attend such conferences, discovery proceedings, hearings, trials, and appeals as may be reasonably requested. Any reasonable out-of-pocket costs and expenses incurred by Sellers at the request of Buyer shall be reimbursed by Buyer.

35

## ARTICLE VIII

### MISCELLANEOUS

Section 8.01    Waiver.  The failure of any of the Parties to enforce at any time any of the provisions of this Agreement or any Ancillary Agreement shall in no way be construed to be a waiver of any such provision, nor in any way to affect the validity of this Agreement or any Ancillary Agreement or any part hereof or thereof or the right of any party thereafter to enforce each and every such provision.  No waiver of any breach of or non-compliance with this Agreement or any Ancillary Agreement shall be held to be a waiver of any other subsequent breach or non-compliance.

Section 8.02    Notices.  All notices or other communications required or permitted to be given hereunder shall be in writing and shall be delivered by hand or sent by facsimile or sent, postage prepaid, by overnight or express courier service and shall be deemed given when so delivered by hand or facsimile, or if sent by overnight or express courier service, three business days after being sent, as follows:

(a) If to Buyer:

Arc Terminals LP
c/o Arc Terminals Holdings LLC
3000 Research Forest Drive
Suite 250
The Woodlands, TX  77381
Facsimile:  (212) 888-2854
Attention:  John S. Blanchard

with a required copy to:

Lightfoot Capital Partners, LP
725 Fifth Avenue, 19th Floor
New York, NY  10022
Facsimile:  (212) 888-2855
Attention:  Vincent T. Cubbage

(b) If to Sellers:

c/o Dunhill Products, L.P.
7026 Old Katy Rd., Suite 249
Houston, TX  77024
Telephone:  (713) 476-9900
Fax:  (713) 426-2108
Attention:  Patricia A. Waters

with a copy to:

Seyfarth Shaw, LLP
700 Louisiana St., Suite 3700
Houston, TX 77002
Telephone:  (713) 238-1812
Fax:  (713) 821-0673
Attention: Mr. Anthony F. Newton

36

US 301674v.3

Section 8.03    Definitions. (a) For purposes of this Agreement:

"Affiliate" of any Person means another Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such first Person.

"Bill of Sale" means the bill of sale and assignment and assumption agreement substantially in the form attached hereto as Exhibit B.

"Business" means the construction, ownership, use, maintenance and operation of the Facilities (including the Terminals) and the business currently conducted therefrom and anticipated to be conducted upon the completion of the Blakeley Terminal.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks in New York, New York are authorized to close.

"Capital Stock" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including partnership interests and membership interests, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing.

"Cash Consideration" shall mean the amount of $500,000.

"Closing Deliverables" means the Buyer's Closing Deliverables and the Sellers' Closing Deliverables.

"Closing Documents" means the Assignment and Assumption of Lease substantially in the form attached hereto as Exhibit C-1 for the Leased Real Property, a Special Warranty Deed substantially in the form attached hereto as Exhibit C-2, and the Bill of Sale.

"Collateral" means all property and property rights of any nature whatsoever pledged or given as security or collateral for the Loans in the documents described on Schedule 8.03(a) attached hereto.

"Confidentiality Agreement" means the letter agreement dated September 14, 2007 and supplemented by the letter agreement dated July 13, 2009, between Buyer and Dunhill Terminals LP.

"Cure Amount" means all unpaid monetary obligations under an executory contract or unexpired lease required to be satisfied to assume a contract or lease pursuant to § 365 of the Bankruptcy Code.

"Encumbrances" means mortgages, liens, security interests, charges, hypothecations, easements, leases, subleases, covenants, rights of way, options, claims, restrictions or encumbrances of any kind.

37

"Fixtures and Improvements" means the buildings, offices, warehouses, loading and unloading facilities, tanks, works, structures, fixtures, improvements, betterments, installations and additions constructed, erected or located on or attached or affixed to the Real Property.

"Initial Credit Bid Amount" means $40,000,000, or such other amount as provided by written notice from the Buyer to the Sellers.

"Loans" means the (i) Construction Loan Note in the principal amount of $26,000,000, dated November 21, 2007, executed by Dunhill Terminals LP, L.P., and Dunhill Entities, L.P., to the order of Regions Bank, (ii) Construction Loan Note in the principal amount of $24,000,000, dated March 3, 2008, executed by Dunhill Terminals LP, L.P., and Dunhill Entities, L.P., to the order of Columbus Bank and Trust Company, (iii) Promissory Note in the principal amount of $8,500,000, dated January 20, 2009, executed by Dunhill Terminals LP and Dunhill Entities, L.P., to the order of Regions Bank, (iv) Demand Promissory Note in the principal amount of $412,998.70, dated July 31, 2009, executed by Dunhill Terminals LP and Dunhill Entities, L.P., to the order of Regions Bank and (v) Demand Promissory Note in the principal amount of $742,443.82, dated July 31, 2009, executed by Dunhill Products, LP, to the order of Regions Bank.

"Material Adverse Effect" means any material adverse effect on the Purchased Assets (taken as a whole) or the operations, financial condition or results of operations or prospects of the Business; provided, however, that the following shall not be considered a Material Adverse Effect: (i) changes, events, inaccuracies, circumstances and effects that are caused by (x) economic or business conditions in the United States generally, (y) conditions affecting the industry in which the Business competes as a whole, or (z) military action or any act of terrorism; (ii) any adverse change attributable to the public announcement or disclosure of the existence of this Agreement, or (iii) any change in Applicable Law.

"Omnibus Agreement" means the Amended and Restated Omnibus Agreement, dated March 10, 2010, by and among Buyer and Sellers.

"Permits" means all permits, authorizations, certificates, licenses, approvals, registrations, consents, orders, approvals or similar rights of every kind or character granted by any Governmental Entities or required by Applicable Law.

"Permitted Encumbrances" means (i) Encumbrances for current Taxes which are not yet due and payable, and (ii) Encumbrances terminated by a final and non-appealable Sale Order.

"Person" means any individual, firm, corporation, partnership, limited partnership, limited liability partnership, company, limited liability company, trust, joint venture, association, Governmental Entity or other entity.

"Petroleum and Other Product" means (i) liquid fuels derived from refined or processed hydrocarbons, (ii) liquid fuels derived from renewable energy sources, including biofuels and ethanol and (iii) any other products currently or historically stored at the Terminals.

"Real Property" means the Owned Real Property, Leased Real Property and Easements.

38

"Reference Balance Sheet" means the balance sheet of the Business attached hereto as Exhibit A.

"Reference Balance Sheet Date" means December 31, 2009.

"Related Party Transaction" means any transaction, agreement or arrangement between a Seller or any of its Affiliates, on the one hand, and another Seller or an Affiliate of a Seller or an officer, director, partner, stockholder, member or employee of a Seller or an Affiliate of a Seller.

"Sale Order" means an order of the Bankruptcy Court approving the sale of the Purchased Assets.

"Seller Plan" means each benefit, employment, personal services, compensation, incentive, stock option, restricted stock, stock appreciation right, phantom equity, change in control, severance, vacation and other similar agreement, plan, policy and other arrangement (and any amendments thereto) currently in effect and covering one or more current employees of Sellers or any of their Affiliates, who works for or with respect to the Business, and that is maintained by Sellers or any of their Affiliates or with respect to Sellers or any of their Affiliates.

"Transfer Taxes" means any transfer, conveyance, documentary, sales, use, registration, value added, real property transfer, real property transfer gains, stamp and other similar Taxes or government charges (together with any interest or penalty, addition to tax or additional amount imposed) as levied by any Taxing Authority in connection with the transactions contemplated by this Agreement.

"U.S. GAAP" means generally accepted accounting principles in the United States, consistently applied.

"Winning Bidder" means the bidder selected pursuant to a final order to acquire the Purchased Assets.

(b)     The following terms have the meanings set forth in the Sections set forth below:

| Term | Section |
| --- | --- |
| Affiliate | 8.03(a) |
| Agreement | Preamble |
| Applicable Law | 3.03 |
| As-Built Surveys | 5.11 |
| Asset Acquisition Statement | 1.04 |
| Assigned Contracts | 1.01(a)(v) |
| Assigned Permits | 1.01(a)(iv) |
| Assigned Records | 1.01(a)(vi) |
| Assumed Liabilities | 1.02(a) |
| Bankruptcy Case(s) | Recital 1 |
| Bankruptcy Code | Recital 1 |

39

US 301674v.3

| **Term** | **Section** |
|----------|-------------|
| Bankruptcy Court | Recital 1 |
| Bid Procedures | 1.03(b) |
| Bid Procedures and Sale Motion | 1.03(b) |
| Bid Procedures Order | 1.03(b) |
| Bill of Sale | 8.03(a) |
| Blakeley Terminal | Recital 3 |
| BS&W | 5.14 |
| Business | 8.03(a) |
| Business Day | 8.03(a) |
| Buyer | Preamble |
| Buyer Indemnitee and Buyer Indemnitees | 7.01 |
| Buyer's Closing Deliverables | 2.02(b) |
| Buyer's Representatives | 5.02 |
| Capital Stock | 8.03(a) |
| Chickasaw Terminal | Recital 3 |
| Claims | 7.07(a) |
| Closing | 2.01 |
| Closing Date | 2.01 |
| Closing Deliverables | 8.03(a) |
| Closing Documents | 8.03(a) |
| Code | 3.08(a) |
| Collateral | 8.03(a) |
| Confidential Information | 5.03(b) |
| Confidentiality Agreement | 8.03(a) |
| Consent | 3.03 |
| Contracts | 1.01(a)(v) |
| Cure Amount | 8.03(a) |
| Damages | 7.01 |
| Dunhill Entities LP | Preamble |
| Dunhill Terminals LP | Preamble |
| Easement Areas | 3.07(b)(i) |
| Easements | 3.07(b)(i) |
| Encumbrances | 8.03(a) |
| Environmental Condition | 3.12(c) |
| Environmental Laws | 3.12(b) |
| Excluded Assets | 1.01(b) |
| Excluded Liabilities | 1.02(c) |
| Facilities | 1.01(a)(i) |
| Fixtures and Improvements | 8.03(a) |
| GO Zone | 1.02(c)(v) |
| Governmental Entity | 3.03 |
| Hazardous Materials | 3.12(d) |
| Intellectual Property | 1.01(a)(iii) |
| Leased Real Property | 3.07(a)(i) |
| Loan Purchase | Recital 2 |

40

| Term | Section |
|------|---------|
| Material Adverse Effect | 8.03(a) |
| Order | 3.03 |
| Party and Parties | Preamble |
| Permits | 8.03(a) |
| Permitted Encumbrances | 8.03(a) |
| Person | 8.03(a) |
| Personal Property | 1.01(a)(ii) |
| Petroleum and Other Product | 8.03(a) |
| Prohibited Activities | 5.10 (b) |
| Purchased Assets | 1.01(a) |
| Reference Balance Sheet | 8.03(a) |
| Reference Balance Sheet Date | 8.03(a) |
| Related Party Transaction | 8.03(a) |
| Release | 3.12(e) |
| Released Matters | 7.07(a) |
| Released Party | 7.07(a) |
| Releasing Party | 7.07(a) |
| Revised Statement | 1.04 |
| Seller and Sellers | Preamble |
| Seller Indemnitee and Seller Indemnitees | 7.02 |
| Seller Parties | 5.03(b) |
| Seller Plan | 8.03(a) |
| Seller's Closing Deliverables | 2.02(a) |
| Stalking Horse Buyer | 1.03(a) |
| Substantial Customer | 3.19 |
| Tank Gauging and Sampling | 5.14 |
| Tax and Taxes | 3.08(a) |
| Tax Returns | 3.08(a) |
| Taxing Authority and Taxing Authorities | 3.08(a) |
| Terminals | Recital 3 |
| Termination Date | 2.04(b) |
| Title Company | 5.12 |
| Title Policy | 6.02(e) |
| Transfer Taxes | 8.03(a) |
| U.S. GAAP | 8.03(a) |
| Voluntary Petitions | Recital 1 |
| WARN Act | 3.09(b) |

Section 8.04    Severability.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any Applicable Law, or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, such term or other provision will be interpreted so as to best accomplish the intent of the parties within the limits of Applicable Law.

41

Section 8.05    Counterparts.    This Agreement may be executed in one or more facsimile or electronic counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties and delivered to the other parties.

Section 8.06    Entire Agreement.    This Agreement and the Omnibus Agreement contains the entire understanding of the parties hereto with respect to the subject matter contained herein, supersedes and cancels all prior agreements, negotiations, correspondence, undertakings and communications of the parties, oral or written, respecting such subject matter. There are no restrictions, promises, representations, warranties, agreements or undertakings of any party hereto with respect to the transactions under this Agreement other than those set forth herein or made hereunder.

Section 8.07    Amendments.    This Agreement may be amended only by a written instrument executed by the parties or their respective successors or permitted assigns.

Section 8.08    Successors in Interest; No Third-Party Beneficiaries; Assignment.    This Agreement shall inure to the benefit of and be binding upon Sellers and Buyer and their respective successors and permitted assigns.  Except as provided in or contemplated by Article VII (which shall confer upon the Persons referred to therein for whose benefit it is intended the right to enforce such Article), nothing in this Agreement, express or implied, is intended to confer upon any Person not a party to this Agreement any rights or remedies under or by reason of this Agreement.  No party to this Agreement may assign or delegate all or any portion of its rights, obligation or liabilities under this Agreement without the prior written consent of the other parties to this Agreement; provided that Buyer may assign this Agreement to an affiliate of Buyer without the consent of Sellers or any other person.

Section 8.09    Governing Law.  This Agreement shall be governed by, and construed in accordance with, the law of the State of Texas without reference to choice of law principles, including all matters of construction, validity and performance.

Section 8.10    Jurisdiction of the Bankruptcy Court; Dispute Resolution; No Jury.

(a)    Without limiting any party's right to appeal any Order of the Bankruptcy Court, the parties agree that the Bankruptcy Court will have exclusive jurisdiction over any disputes arising under this Agreement.

(b)    In the event the Bankruptcy Court does not have jurisdiction over a dispute that arises under this Agreement, or for whatever reason fails or refuses to take jurisdiction over any other dispute arising hereunder then, except as otherwise expressly set forth in this Agreement, the parties hereby agree, to the fullest extent permitted by Law, to submit all controversies, disputes and claims arising hereunder and not otherwise resolved by the parties in writing to the exclusive jurisdiction of the appropriate State of Texas court located in Houston, Texas or, to the extent permitted by Law, the federal courts in Houston, Texas (to whose jurisdiction the parties hereby irrevocably, unqualifiedly and unconditionally submit), and to any appellate court from any therefrom, in any dispute arising out of or relating to this Agreement, and each party hereby irrevocably, unqualifiedly and unconditionally agrees that all claims and

US 301674v.3

Losses in respect of any such dispute may be heard and determined in such State of Texas court, or to the extent permitted by Law, in such federal court. Each of the parties hereby irrevocably, unqualifiedly and unconditionally waives, to the fullest extent it may effectively do so, any defense of any inconvenient forum or improper venue to the maintenance of any such dispute in any such court and any right of jurisdiction on account of its place of residence or domicile. Each of the parties irrevocably, unqualifiedly and unconditionally consents to the service of any and all process in any such dispute in such State of Texas or federal court by the sending of such process in the manner permitted or required by Applicable Law. Each of the parties agrees that the final judgment in any such dispute, following exhaustion of all remedies by appeal, shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(c) **EACH OF THE PARTIES HEREBY WAIVES ITS RIGHT TO TRIAL BY JURY IN ANY DISPUTE ARISING HEREUNDER AND CONSENTS TO TRIAL WITHOUT A JURY, AS EVIDENCED BY ITS EXECUTION AND DELIVERY OF THIS AGREEMENT.**

Section 8.11 Disclaimer of Warranties. EXCEPT TO THE EXTENT OF THE EXPRESS REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS AGREEMENT, SELLERS ARE SELLING THE ASSETS ON AN "AS IS, WHERE IS" BASIS AND DISCLAIM ALL OTHER WARRANTIES AND REPRESENTATIONS, WHETHER EXPRESS OR IMPLIED. EXCEPT TO THE EXTENT OF THE EXPRESS REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS AGREEMENT, SELLERS MAKE NO REPRESENTATION OR WARRANTY AS TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AND NO IMPLIED WARRANTIES WHATSOEVER. WITHOUT LIMITING THE FOREGOING, AND EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, SELLERS DISCLAIM ANY WARRANTY OF TITLE OR NON-INFRINGEMENT AND ANY WARRANTY ARISING BY INDUSTRY CUSTOM OR COURSE OF DEALING. BUYER ACKNOWLEDGES AND AGREES THAT IT IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS AGREEMENT.

Section 8.12 Sellers' Representative. Sellers hereby appoints and authorizes Patricia A. Waters to serve as their agent for purposes of receiving payments, notices, consents and other communications from Buyer pursuant to this Agreement. Any payment, notice, consent or other communication provided by Buyer to Patricia A. Waters shall be deemed a payment, notice, consent or other communication to all Sellers, and Patricia A. Waters shall be solely responsible for any division of payments, forwarding of notices, consents or other communications, or other similar actions. Buyer shall have no responsibility to request or inform Patricia A. Waters of any such division, forwarding or other action.

Section 8.13 Interpretation.

(a) Unless the context otherwise requires, (i) all references made in this Agreement to a Section, Schedule or an Exhibit are to a Section, Schedule or an Exhibit of or to this Agreement, (ii) each term defined in this Agreement has the meaning ascribed to it, (iii) "or"

43

is disjunctive but not necessarily exclusive and (iv) words in the singular include the plural and vice versa. The table of contents and headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."

(b)     In the event of an ambiguity or question of intent or interpretation, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the extent to which any such party or its counsel participated in the drafting of any provision hereof or by virtue of the extent to which any such provision is inconsistent with any prior draft hereof.

*[Remainder of page intentionally left blank. Signature page follows.]*

44

**BUYER:**

**ARC TERMINALS LP**

By: Arc Terminals GP LLC, its general partner

By: _Vincent Cubbage_

Name: Vincent Cubbage
Title: Authorized Person

*[Signature Page to Asset Purchase Agreement]*

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement, all as of the date first written above.

SELLERS:

DUNHILL ENTITIES, L.P.

By: Dunhill Entities GP, LLC, its general partner

By: _____
Name: Patricia Waters
Title: CFO

DUNHILL ENTITIES GP, LLC

By: _____
Name: Patricia Waters
Title: CFO

DUNHILL TERMINALS, L.P.

By: Dunhill Terminals GP, LLC, its general partner

By: _____
Name: Patricia Waters
Title: CFO

DUNHILL TERMINALS GP, LLC

By: _____
Name: Patricia Waters
Title: CFO

*[Signature Page to Asset Purchase Agreement]*

## JOINDER

In consideration of the material benefits to be derived by the undersigned by reason of the transactions contemplated by this Agreement, the undersigned join this Agreement solely to evidence (i) their consent to and acknowledgment of this Agreement and the transactions contemplated hereby and (ii) to stipulate to the provisions of Section 1.03(a).

_____
HENRY WUERTZ

_____
STEVEN FRIETSCH

_____
SCOTT CLEVELAND

_____
STRYKER EMMERTON

_____
PATRICIA WATERS

_____
ALISTAIR BARNES

_____
SHAWN POTTS

*[Signature Page to Asset Purchase Agreement]*

## JOINDER

In consideration of the material benefits to be derived by the undersigned by reason of the transactions contemplated by this Agreement, the undersigned join this Agreement solely to evidence (i) their consent to and acknowledgment of this Agreement and the transactions contemplated hereby and (ii) to stipulate to the provisions of Section 1.03(a).

_____
HENRY WUERTZ

_____
STEVEN FRIETSCH

_____
SCOTT CLEVELAND

_____
STRYKER EMMERTON

_____
PATRICIA WATERS

_____
ALISTAIR BARNES

_____
SHAWN POTTS

*[Signature Page to Asset Purchase Agreement]*

<u>JOINDER</u>

In consideration of the material benefits to be derived by the undersigned by reason of the transactions contemplated by this Agreement, the undersigned join this Agreement solely to evidence (i) their consent to and acknowledgment of this Agreement and the transactions contemplated hereby and (ii) to stipulate to the provisions of <u>Section 1.03(a)</u>.

_____
HENRY WUERTZ

_____
STEVEN FRIETSCH

_____
SCOTT CLEVELAND

_____
STRYKER EMMERTON

_____
PATRICIA WATERS

_____
ALISTAIR BARNES

_____
SHAWN POTTS

*[Signature Page to Asset Purchase Agreement]*

## JOINDER

In consideration of the material benefits to be derived by the undersigned by reason of the transactions contemplated by this Agreement, the undersigned join this Agreement solely to evidence (i) their consent to and acknowledgment of this Agreement and the transactions contemplated hereby and (ii) to stipulate to the provisions of Section 1.03(a).

_____
HENRY WUERTZ

_____
STEVEN FRIETSCH

_____
SCOTT CLEVELAND

_____
STRYKER EMMERTON

_____
PATRICIA WATERS

_____
ALISTAIR BARNES

_____
SHAWN POTTS

## JOINDER

In consideration of the material benefits to be derived by the undersigned by reason of the transactions contemplated by this Agreement, the undersigned join this Agreement solely to evidence (i) their consent to and acknowledgment of this Agreement and the transactions contemplated hereby and (ii) to stipulate to the provisions of Section 1.03(a).

_____
**HENRY WUERTZ**


_____
**STEVEN FRIETSCH**


_____
**SCOTT CLEVELAND**


_____
**STRYKER EMMERTON**


_____
**PATRICIA WATERS**


_____
**ALISTAIR BARNES**
Attorney-in-fact


_____
**SHAWN POTTS**


*[Signature Page to Asset Purchase Agreement]*

**EMMERTON LLC #1**

By: _Stryker Emmert_
Name: Stryker Emmert
Title:

**SC TRADING LLC**

By: _____
Name:
Title:

**PITTSBURGH OIL**

By: _Shawn Potts_
Name: Shawn Potts
Title: President

*[Signature Page to Asset Purchase Agreement]*

**EMMERTON LLC #1**

By: _____
Name:
Title:

**SC TRADING LLC**

By: _____
Name: *Scott Glendon*
Title: *President*

**PITTSBURGH OIL**

By: _____
Name:
Title:

*[Signature Page to Asset Purchase Agreement]*

# TABLE OF CONTENTS

Page

ARTICLE I PURCHASE AND SALE OF ASSETS ................................................................. 2
    Section 1.01   Purchase and Sale of Assets ..................................................... 2
    Section 1.02   Purchase and Sale ..................................................................... 3
    Section 1.03   Sellers' Chapter 11 Bankruptcy Case ...................................... 6
    Section 1.04   Allocation of Purchase Price .................................................... 6
    Section 1.05   Further Assurances .................................................................... 7

ARTICLE II CLOSING; TERMINATION ............................................................................ 7
    Section 2.01   Closing Date ............................................................................... 7
    Section 2.02   Instruments of Conveyance, Transfer, Assumption, Etc. ....... 8
    Section 2.03   Escrow of Closing Deliverables; Payment of Cash Consideration ........... 9
    Section 2.04   Termination ................................................................................ 9

ARTICLE III REPRESENTATIONS AND WARRANTIES OF SELLERS ............................. 10
    Section 3.01   Organization, Standing and Power ........................................ 10
    Section 3.02   Authority; Enforceability ........................................................ 10
    Section 3.03   No Conflict; Consents ............................................................. 11
    Section 3.04   Financial Statements; Undisclosed Liabilities ...................... 11
    Section 3.05   Litigation ................................................................................. 11
    Section 3.06   Personal Property .................................................................... 12
    Section 3.07   Interests in Real Property ....................................................... 12
    Section 3.08   Tax Matters .............................................................................. 13
    Section 3.09   Employment and Labor Matters ............................................. 16
    Section 3.10   Absence of Change or Event ................................................... 17
    Section 3.11   Compliance With Law; Permits .............................................. 17
    Section 3.12   Environmental Matters ............................................................ 18
    Section 3.13   Contracts .................................................................................. 19
    Section 3.14   Insurance ................................................................................. 19
    Section 3.15   Sellers' Knowledge ................................................................. 19
    Section 3.16   Intellectual Property ................................................................ 19
    Section 3.17   Preferential Purchase Rights ................................................. 20
    Section 3.18   Sufficiency of Assets ............................................................... 20
    Section 3.19   Substantial Customers ............................................................ 20
    Section 3.20   Brokers or Finders .................................................................. 20

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF BUYER ................................. 20
    Section 4.01   Organization, Standing and Power ........................................ 20
    Section 4.02   Authority; Execution and Delivery; Enforceability ............... 21
    Section 4.03   No Conflicts; Consents ............................................................ 21
    Section 4.04   No Litigation ............................................................................ 21
    Section 4.05   Brokers or Finders .................................................................. 21

ARTICLE V COVENANTS RELATING TO CONDUCT OF BUSINESS ............................... 22

US 301674v.3

Case 10-01342   Doc 11-1   Filed 03/26/10   Entered 03/26/10 20:17:03   Desc Exhibit A - Part 1   Page 55 of 82

Section 5.01 Covenants of Sellers Relating to Conduct of Business ............................. 22
Section 5.02 Access to Information ............................................................................... 24
Section 5.03 Confidentiality ......................................................................................... 24
Section 5.04 Commercially Reasonable and Good Faith Efforts ................................. 25
Section 5.05 Expenses; Apportionment of Taxes ....................................................... 25
Section 5.06 Employee Matters .................................................................................... 26
Section 5.07 Post-Closing Cooperation ....................................................................... 26
Section 5.08 Publicity ................................................................................................... 27
Section 5.09 Insurance .................................................................................................. 28
Section 5.10 Non-Competition ..................................................................................... 28
Section 5.11 As-Built Surveys ...................................................................................... 28
Section 5.12 Title Insurance .......................................................................................... 29
Section 5.13 Removal of Property ................................................................................ 29
Section 5.14 Tank Gauging and Sampling ................................................................... 29
Section 5.15 Appointment of Interim Managers .......................................................... 29

ARTICLE VI CONDITIONS PRECEDENT .............................................................................. 30
Section 6.01 Conditions to Each Party's Obligation To Effect The Closing ................ 30
Section 6.02 Conditions to Obligations of Buyer ......................................................... 30
Section 6.03 Conditions to Obligation of Sellers ......................................................... 32

ARTICLE VII INDEMNIFICATION .......................................................................................... 33
Section 7.01 Indemnification by Sellers ....................................................................... 33
Section 7.02 Indemnification by Buyer ......................................................................... 33
Section 7.03 Indemnification Procedure ....................................................................... 33
Section 7.04 Certain Limitations ................................................................................... 34
Section 7.05 Survival of Representations and Warranties ............................................ 34
Section 7.06 Tax Treatment of Indemnity Payments ................................................... 35
Section 7.07 Release of Claims and Indemnification ................................................... 35
Section 7.08 Cooperation .............................................................................................. 35

ARTICLE VIII MISCELLANEOUS ........................................................................................... 36
Section 8.01 Waiver ...................................................................................................... 36
Section 8.02 Notices ...................................................................................................... 36
Section 8.03 Definitions ................................................................................................ 37
Section 8.04 Severability ............................................................................................... 41
Section 8.05 Counterparts ............................................................................................. 42
Section 8.06 Entire Agreement ..................................................................................... 42
Section 8.07 Amendments ............................................................................................. 42
Section 8.08 Successors in Interest; No Third-Party Beneficiaries; Assignment ........ 42
Section 8.09 Governing Law ......................................................................................... 42
Section 8.10 Jurisdiction of the Bankruptcy Court; Dispute Resolution; No Jury ....... 42
Section 8.11 Disclaimer of Warranties ......................................................................... 43
Section 8.12 Sellers' Representative ............................................................................. 43
Section 8.13 Interpretation ............................................................................................ 43

**EXHIBITS**

| | | |
|---|---|---|
| Exhibit A | - | Reference Balance Sheet |
| Exhibit B | - | Bill of Sale and Assignment Agreement |
| Exhibit C-1 | - | Assignment and Assumption of Lease |
| Exhibit C-2 | - | Special Warranty Deed |

**SCHEDULES**

| | | |
|---|---|---|
| Schedule 1.01(a)(iv) | - | Assigned Permits |
| Schedule 1.01(a)(v) | - | Assigned Contracts |
| Schedule 1.01(a)(vii) | - | Customer Deposits |
| Schedule 1.01(b)(i) | - | Excluded Assets |
| Schedule 1.04 | - | Preliminary Allocation of Purchase Price |
| Schedule 2.03(b)(ii) | - | Payment of Sellers |
| Schedule 3.03 | - | No Conflicts; Consents (Sellers) |
| Schedule 3.04 | - | Financial Statements; Undisclosed Liabilities; Related Party Transactions |
| Schedule 3.05 | - | Litigation |
| Schedule 3.06 | - | Personal Property Encumbrances |
| Schedule 3.07(a) | - | Leased Real Property; Owned Real Property |
| Schedule 3.07(b)(i) | - | Easements |
| Schedule 3.07(b)(ii) | - | Easement Documents |
| Schedule 3.07(c) | - | Real Property Encumbrances |
| Schedule 3.07(e) | - | Real Property (ingress and egress) |
| Schedule 3.07(f) | - | Easement Areas (ingress and egress) |
| Schedule 3.07(i) | - | Real Property Taxes |
| Schedule 3.07(j) | - | Real Property Compliance with Laws |
| Schedule 3.08(d)(i) | - | Taxes |
| Schedule 3.08(b)(ii) | - | Tax Return Exceptions |
| Schedule 3.08(e)(ii) | - | Tax Exceptions |
| Schedule 3.09(a) | - | Employment and Labor Matters |
| Schedule 3.09(c) | - | Employees |
| Schedule 3.10 | - | Change or Event |
| Schedule 3.11(a) | - | Compliance with Law |
| Schedule 3.11(b) | - | Permits |
| Schedule 3.12(a) | - | Environmental Matters |
| Schedule 3.13(b)(i) | - | Contract Defaults |
| Schedule 3.13(b)(ii) | - | Expiration of Storage Tank Contracts |
| Schedule 3.13(c) | - | Delinquent Payments |
| Schedule 3.14 | - | Insurance |
| Schedule 3.15 | - | Seller's Knowledge |
| Schedule 3.18(a) | - | Sufficiency of Assets |
| Schedule 3.18(b) | - | Material Repairs Needed |
| Schedule 3.19 | - | Substantial Customers |
| Schedule 3.20 | - | Brokers or Finders |
| Schedule 4.03 | - | No Conflicts; Consents (Buyer) |
| Schedule 6.01(a) | - | Governmental Approvals |
| Schedule 6.02(g) | - | Consents and Approvals (Buyer) |
| Schedule 6.03(d) | - | Consents and Approvals (Sellers) |
| Schedule 8.03(a) | - | Collateral |

US 301674v.3

## REFERENCE BALANCE SHEET

(attached.)

BALANCE SHEET

Dunhill Terminals, L. P.

*FOR THE MONTH ENDING DECEMBER, 31 2009*

## Assets

**Current Assets**

| | | |
|---|---:|---:|
| Cash & Equivalents | $ 1,012.52 | |
| Due To/From – Related Companies | (2,403,234.93) | |
| Accounts Receivable | 758,182.68 | |
| Prepaid Expenses | 318,767.05 | |
| Deposits | 25,000.00 | |
| TOTAL Current Assets | | $ (1,292,282.68) |

**Fixed Assets**

| | | |
|---|---:|---:|
| Property, Plant and Equipment | 34,032,184.67 | |
| Accum Depr. | (15,448,906.54) | |
| TOTAL Fixed Assets | | 18,592,278.13 |
| | | |
| **Total Assets** | | **$ 17,299,995.45** |

## Liabilities and Equity

**Current Liabilities**

| | | |
|---|---:|---:|
| Accounts Payable – Trade | $ 758,596.73 | |
| Accrued Accounts | 1,361,827.54 | |
| Other Payables | 73,333.34 | |
| TOTAL Current Liabilities | | $ 2,193,757.61 |

**Long Term Liabilities**

| | | |
|---|---:|---:|
| Notes Payable | $ 36,939,097.26 | |
| Deposits | 18,000.00 | |
| TOTAL Long Term Liabilities | | $ 36,957,097.26 |
| | | |
| TOTAL LIABILITIES | | 39,150,854.87 |

**Equity**

| | | |
|---|---:|---:|
| Partner Capital | (21,850,859.42) | |
| TOTAL Equity | | $ (21,850,859.42) |
| | | |
| TOTAL Liabilities and Equity | | $ 17,299,995.45 |

BALANCE SHEET

*FOR THE MONTH ENDING December 31, 2009*

## Assets

**Current Assets**

| | | |
|---|---:|---:|
| Cash & Equivalents | $ 1,347.60 | |
| Due To/From - Related Companies | 336,843.26 | |
| Accounts Receivable | 27,131.84 | |
| Prepaid Expenses | 5,305.00 | |
| Deposits | 33,600.00 | |
| TOTAL Current Assets | | $ 394,027.69 |

**Fixed Assets**

| | | |
|---|---:|---:|
| Property, Plant and Equipment | 295,768.27 | |
| Accum Depr. | (111,380.31) | |
| TOTAL Fixed Assets | | 184,387.96 |
| **Total Assets** | | **$ 578,455.55** |

## Liabilities and Equity

**Current Liabilities**

| | | |
|---|---:|---:|
| Accounts Payable - Trade | $ 514,975.66 | |
| Accrued Accounts | 286.73 | |
| Other Payables | (9,559.99) | |
| TOTAL Current Liabilities | | $ 504,704.39 |

**Long Term Liabilities**

| | | |
|---|---:|---:|
| Notes Payable | | |
| Deposits | | |
| TOTAL Long Term Liabilities | | $ — |
| **TOTAL LIABILITIES** | | 504,704.39 |

**Equity**

| | | |
|---|---:|---:|
| Partner Capital | 73,751.17 | |
| TOTAL Equity | | $ 73,751.17 |
| **TOTAL Liabilities and Equity** | | **$ 578,455.56** |

System Date: 3/26/2010 12:32 PM                                Page: 1

BALANCE SHEET

Dunhill Entities, L. P.

*FOR THE MONTH ENDING JANUARY 31, 2010*

## Assets

### Current Assets

| | | |
|---|---|---|
| Cash & Equivalents | $ 8,440.21 | |
| Due To/From - Related Companies | -4,357,902.78 | |
| Accounts Receivable | 10,842.39 | |
| Prepaid Expenses | 79,290.04 | |
| Deposits | 8,000.00 | |
| TOTAL Current Assets | | $ 4,500,575.40 |

### Fixed Assets

| | | |
|---|---|---|
| Property, Plant and Equipment | 19,043,059.35 | |
| Accum Depr. | (4,875,112.91) | |
| TOTAL Fixed Assets | | 14,167,945.44 |
| **Total Assets** | | $ 18,668,520.84 |

## Liabilities and Equity

### Current Liabilities

| | | |
|---|---|---|
| Accounts Payable - Trade | $ 2,702,371.83 | |
| Accrued Accounts | | |
| Other Payables | | |
| TOTAL Current Liabilities | | $ 2,702,371.83 |

### Long Term Liabilities

| | | |
|---|---|---|
| Notes Payable | $ 20,603,400.45 | |
| TOTAL Long Term Liabilities | | $ 20,603,400.45 |
| TOTAL LIABILITIES | | 23,305,772.28 |

### Equity

| | | |
|---|---|---|
| Partner Capital | (4,637,251.44) | |
| TOTAL Equity | | $ (4,637,251.44) |
| TOTAL Liabilities and Equity | | $ 18,668,520.84 |

Case 10-01342   Doc 11-1   Filed 03/26/10   Entered 03/26/10 20:17:03   Desc Exhibit
A - Part 1   Page 61 of 82

## Assets

Current Assets

| | | | | |
|---|---|---|---|---|
| Cash & Equivalents | $ | 675.17 | | |
| Due To/From – Related Companies | | (10,606.52) | | |
| | | | | |
| TOTAL Current Assets | | | $ | (9,931.35) |

Fixed Assets

| | | | |
|---|---|---|---|
| Property, Plant and Equipment | - | | |
| Accum Depr. | - | | |
| TOTAL Fixed Assets | | | - |
| | | | |
| Total Assets | | $ | (9,931.35) |

## Liabilities and Equity

Equity

| | | | |
|---|---|---|---|
| Partner Capital | (9,931.35) | | |
| | | | |
| TOTAL Equity | | $ | (9,931.35) |
| | | | |
| TOTAL Liabilities and Equity | | $ | - |

## FORM OF BILL OF SALE AND ASSIGNMENT

THIS BILL OF SALE AND ASSIGNMENT (this "Bill of Sale"), dated as of [●], 2010, is made between Dunhill Entities, L.P., a Texas limited partnership, Dunhill Entities GP, LLC, a Texas limited liability company, Dunhill Terminals, L.P., a Texas limited partnership and Dunhill Terminals GP, LLC, a Texas limited liability company (collectively, "Sellers" and each a "Seller"), and Arc Terminals LP, a Delaware limited partnership ("Buyer").

### RECITALS

A.    Buyer and Sellers have entered into that certain Asset Purchase Agreement, dated March 10, 2009 (the "Asset Purchase Agreement"), by and among Sellers and Buyer, pursuant to which Buyer is to purchase, acquire and accept, among other assets, all of Sellers' right, title and interest in and to the Purchased Assets (other than the Real Property, the "Personal Property Assets") from Sellers, and Sellers are to sell, transfer, assign and deliver to Buyer, among other assets, all of Sellers' right, title and interest in and to the Personal Property Assets. Each capitalized term used herein, and not otherwise defined herein, has the meaning given to such term in the Asset Purchase Agreement.

B.    The Sellers are debtors and debtors-in-possession under Chapter 11 of the United States Bankruptcy Code in Case No. [——] (the "Bankruptcy Case") pending in the United States Bankruptcy Court for the Southern District of Alabama ("Bankruptcy Court").

C.    The Asset Purchase Agreement was approved by the "Order _____ _____" entered by the Bankruptcy Court in the Bankruptcy Case on _____ ___, 2010 as Docket No. _____ (the "Sale Order"), which Sale Order authorized the sale of the Sellers' assets, pursuant to the Asset Purchase Agreement, including the Personal Property Assets, free and clear of all Liens, except for the Permitted Encumbrances and the Assumed Liabilities.

D. .    Sellers execute and deliver this Bill of Sale to Buyer for the purpose of transferring and vesting in Buyer title to the Personal Property Assets as set forth herein, free and clear of all Liens, except for the Permitted Encumbrances and the Assumed Liabilities.

### AGREEMENT

In consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    Sellers hereby sell, transfer, assign and deliver to Buyer, its successors and assigns forever, all of Sellers' right, title and interest in and to the Personal Property Assets, free and clear of all Liens, except for the Permitted Encumbrances and the Assumed Liabilities. The Personal Property Assets shall not include the Excluded Assets.

2.     Sellers hereby covenant that, from time to time after the delivery of this Bill of Sale, at Buyer's request, Sellers will use commercially reasonable efforts to do, execute, acknowledge and deliver, or shall cause to be done, executed, acknowledged and delivered, such further acts, conveyances, transfers, assignments, powers of attorney and assurances as Buyer may reasonably require to convey, transfer to and vest in Buyer, and to put Buyer in possession of, all of Sellers' right, title and interest in and to the Personal Property Assets, including without limitation, the delivery to Buyer of certificates of title to all titled motor vehicles included in the Personal Property Assets, if any.

3.     Buyer hereby assumes and agrees to timely perform and discharge the Assumed Liabilities (provided, the Assumed Liabilities shall not include the Excluded Liabilities or any liabilities resulting from or relating to any breach or non-fulfillment of any representation or warranty, covenant or agreement on the part of Sellers for which Buyer is entitled to indemnification pursuant to the Purchase Agreement).

4.     This Agreement shall be subject to the terms and conditions set forth in the Purchase Agreement, and nothing contained in this Bill of Sale shall be construed to limit, terminate or expand the representations, warranties and covenants set forth in the Purchase Agreement. Nothing in this Agreement shall alter any liability or obligation of Sellers or Buyer arising under the Purchase Agreement.

5.     This Bill of Sale shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

6.     This Agreement shall be construed in accordance with and governed by the internal laws of the State of Alabama (without reference to its rules as to conflicts of law). For so long as the Sellers are subject to the jurisdiction of the Bankruptcy Court, all parties hereto irrevocably elect as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court. After the Sellers are no longer subject to the jurisdiction of the Bankruptcy Court, the parties hereto hereby irrevocably submit to the non-exclusive jurisdiction of any federal court sitting in the State of Alabama with respect to any action or proceeding arising out of or relating to this Agreement.

7.     **EACH OF THE PARTIES HEREBY WAIVES TRIAL BY JURY IN ANY CLAIM, ACTION, SUIT, ARBITRATION, INQUIRY, PROCEEDING OR INVESTIGATION TO WHICH SUCH PARTY IS A PARTY INVOLVING, DIRECTLY OR INDIRECTLY, ANY MATTER IN ANY WAY ARISING OUT OF, RELATED TO OR IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED IN THIS AGREEMENT.**

8.     This Bill of Sale may be executed and delivered (including by facsimile transmission) in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

9.     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Purchase Agreement.

2

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

3

IN WITNESS WHEREOF, the parties have executed this Bill of Sale as of the date first written above.

SELLERS:

DUNHILL ENTITIES, L.P.

By: Dunhill Entities GP, LLC, its general partner

By: _____
    Name:
    Title:

DUNHILL ENTITIES GP, LLC

By: _____
    Name:
    Title:

DUNHILL TERMINALS, L.P.

By: Dunhill Terminals GP, LLC, its general partner

By: _____
    Name:
    Title:

DUNHILL TERMINALS GP, LLC

By: _____
    Name:
    Title:

[SIGNATURE PAGE
BILL OF SALE]

US 298334v.2

BUYER:

ARC TERMINALS LP

By: Arc Terminals GP LLC, its general partner


By: _____
    Name:
    Title:

[SIGNATURE PAGE
BILL OF SALE]

US 298334v.2

**EXHIBIT C-1**

## FORM OF ASSIGNMENT OF LEASES

THIS ASSIGNMENT AND ASSUMPTION OF LEASES (the "Assignment") is entered into as of [●], 2010 (the "Effective Date"), between Dunhill Entities, L.P., a Texas limited partnership, Dunhill Terminals GP, LLC, a Texas limited liability company, Dunhill Entities GP, LLC, a Texas limited liability company and Dunhill Terminals, L.P., a Texas limited partnership (together, "Assignor"), whose address is _____, and Arc Terminals LP, a Delaware limited partnership ("Assignee"), whose address is _____.

### RECITALS

A.      Assignor is the lessee or sublessee under those certain leases described on Exhibit A attached hereto and made a part hereof (collectively the "Leases").

B.      Assignor and Assignee have entered into that certain Asset Purchase Agreement dated as of March 10, 2010 (the "Asset Purchase Agreement") pursuant to which Assignee agreed to purchase the Leases, among other assets, from Assignor, and Assignor agreed to sell such Leases and other assets, on the terms and conditions contained therein. Accordingly, Assignor desires to assign its interest as lessee in the Leases to Assignee, and Assignee desires to accept the assignment thereof, on the terms and conditions below. Each capitalized term used herein, and not otherwise defined herein, has the meaning given to such term in the Asset Purchase Agreement.

C.      Assignor is a debtor and debtor-in-possession under Chapter 11 of the United States Bankruptcy Code in Case No. [-----] (the "Bankruptcy Case") pending in the United States Bankruptcy Court for the Southern District of Alabama ("Bankruptcy Court").

D.      The Asset Purchase Agreement was approved by the "Order _____" entered by the Bankruptcy Court in the Bankruptcy Case on _____, 2010 as Docket No. _____ (the "Sale Order," a copy of which is attached hereto and made a part hereof as Exhibit B), which Sale Order authorized the sale of Assignor's assets pursuant to the Asset Purchase Agreement, including the sale, transfer and assumption and assignment of the Leases transferred by this Assignment, free and clear of all Liens, except for the Permitted Encumbrances and the Assumed Liabilities.

E.      This Assignment is executed and delivered to effect and in conjunction with the closing of the transactions contemplated by the Asset Purchase Agreement and approved by the Sale Order.

### AGREEMENT

In consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

US 298346v.2

Case 10-01342    Doc 11-1    Filed 03/26/10    Entered 03/26/10 20:17:03    Desc Exhibit A - Part 1    Page 68 of 82

1.    Assignment of Leases. Assignor assigns to Assignee, its successors and assigns, subject to the exceptions and reservations herein contained, all of its right, title, and interest in and to the Leases, ("Assigned Interests").

2.    Assumption of Leases. Assignee accepts the assignment of all of the Assigned Interests under the Leases, and Assignee hereby agrees to perform and discharge all of the Assignor's executory obligations as lessee or sublessee under the Leases on and after the Effective Time allocable or attributable to the period commencing at the Effective Time and accruing on or after the Effective Time, to the extent assumed by Buyer pursuant to the Asset Purchase Agreement and the Sale Order.

3.    Miscellaneous. This Assignment, and the terms, covenants, provisions and conditions contained in this Assignment shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns. This Assignment shall be governed and construed in accordance with the laws of the State of Alabama without giving effect to principles of conflicts of laws. This Assignment may be executed in any number of counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument. Assignee hereby expressly acknowledges and affirms the provisions of the Sale Agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.]

Assignor and Assignee have executed this Assignment as of the Effective Date.

ASSIGNOR:

DUNHILL ENTITIES, L.P.

By: Dunhill Entities GP, LLC, its general partner

By: _____
    Name:
    Title:

STATE OF ALABAMA  )
                  )  :SS
COUNTY OF        )

    The foregoing instrument was acknowledged before me this the ____ day of _____, 2010, by _____, as _____ of _____, a _____, for the company.

    My commission expires: _____.

                              _____
                              NOTARY PUBLIC

[Signature Page –
Assignment of Leases]

US 298346v.2

ASSIGNOR:

DUNHILL TERMINALS, L.P.

By: Dunhill Terminals GP, LLC, its general partner


By: _____
    Name:
    Title:


STATE OF ALABAMA  )
                  )  :SS
COUNTY OF         )

    The foregoing instrument was acknowledged before me this the ____ day of _____, 2010, by _____, as _____ of _____, a _____, for the company.

    My commission expires: _____,


                 _____
                 NOTARY PUBLIC


[Signature Page –
Assignment of Leases]

US 298346v.2

ASSIGNOR:

DUNHILL ENTITIES GP, LLC

By: _____
      Name:
      Title:


STATE OF ALABAMA  )
                 )  :SS
COUNTY OF         )

    The foregoing instrument was acknowledged before me this the ____ day of _____, 2010, by _____, as _____ of _____, a _____, for the company.

    My commission expires: _____.


_____
NOTARY PUBLIC

[Signature Page –
Assignment of Leases]

US 298346v.2

ASSIGNOR:

DUNHILL TERMINALS GP, LLC

By: _____
    Name:
    Title:

STATE OF ALABAMA  )
                )  :SS
COUNTY OF         )

    The foregoing instrument was acknowledged before me this the ___ day of _____, 2010, by _____, as _____ of _____, a _____, for the company.

    My commission expires: _____.

_____
NOTARY PUBLIC

[Signature Page –
Assignment of Leases]

ASSIGNEE:

ARC TERMINALS LP

By: Arc Terminals GP LLC, its general partner

By: _____
    Name:
    Title:


STATE OF NEW YORK    )
                    ) :SS
COUNTY OF           )

    The foregoing instrument was acknowledged before me this the ___ day of _____, 2010, by _____, as _____ of _____, a _____, for the company.

    My commission expires: _____.


                    _____
                    NOTARY PUBLIC

## EXHIBIT A

### LEASES

A-1

US 298346v.2

**EXHIBIT B**

SALE ORDER

(attached hereto)

C-1

**EXHIBIT C-2**

## FORM OF SPECIAL WARRANTY DEED

THIS SPECIAL WARRANTY DEED, is made and entered into as of the _____ day of _____, 2010, by and between Dunhill Entities, L.P., a Texas limited partnership ("Grantor"), whose mailing address is _____ and Arc Terminals LP, a Delaware Limited Partnership ("Grantee"), whose mailing address is _____.

### R E C I T A L S

A.    Pursuant to that certain Asset Purchase Agreement, dated March 10, 2010 (the "Asset Purchase Agreement"), between Grantor, certain of Grantor's affiliated companies, and Grantee, Grantor agreed to convey certain assets to Grantee. Each capitalized term used herein, and not otherwise defined herein, has the meaning given to such term in the Asset Purchase Agreement.

B.    Grantor is a debtor and debtor-in-possession under Chapter 11 of the United States Bankruptcy Code in Case No. [—] (the "Bankruptcy Case") pending in the United States Bankruptcy Court for the Southern District of Alabama ("Bankruptcy Court").

C.    The Asset Purchase Agreement was approved by the "Order _____" entered by the Bankruptcy Court in the Bankruptcy Case on _____ ___, 2010 as Docket No. _____ (the "Sale Order," a copy of which is attached hereto and made a part hereof as Exhibit A), which Sale Order authorized the sale of Grantor's assets, including the property conveyed by this Deed, free and clear of all Liens, except for the Permitted Encumbrances and the Assumed Liabilities.

D.    This Deed is executed and delivered to effect and in conjunction with the closing of the transactions contemplated by the Asset Purchase Agreement and approved by the Sale Order.

### W I T N E S S E T H:

THAT for and in consideration of the total sum of $_____, cash in hand paid in accordance with the Asset Purchase Agreement, the receipt of which is hereby acknowledged, Grantor hereby conveys to Grantee, subject to the reservations and exceptions herein contained, that certain real property located in Mobile County, Alabama, and being more particularly described on Exhibits B and C attached hereto and made a part hereof.

TO HAVE AND TO HOLD, the above-described property unto Grantee, its successors and assigns forever, with Covenant of SPECIAL WARRANTY of title.

PROVIDED, HOWEVER, this conveyance is made subject to any easements, restrictions, covenants, agreements and stipulations of record affecting said property, and taxes and assessments for the current year, which taxes and assessments and those of succeeding years, Grantee assumes and agrees to pay.

1

[Pursuant to Section 1146 of the United States Bankruptcy Code and as set forth in Paragraph _____ of the Sale Order, the execution and delivery of any instrument of transfer shall not be taxed under any law imposing a transfer tax, stamp tax or similar tax.]

2

US 298339v.2

IN TESTIMONY WHEREOF, witnesseth the signatures of the parties as of the date first above written.

GRANTOR:

DUNHILL ENTITIES, L.P.

By: Dunhill Entities GP, LLC, its general partner

By: _____
    Name:
    Title:

STATE OF ALABAMA     )
                     )   :SS
COUNTY OF _____  )

The foregoing instrument was acknowledged before me this the ___ day of _____, 2010, by _____, as _____ of Dunhill Entities L.P., a Delaware limited partnership, on behalf of the company.

My commission expires: _____.

_____
NOTARY PUBLIC

3

US 298339v.2

GRANTEE:

ARC TERMINALS LP

By: Arc Terminals GP LLC, its general partner


By: _____
    Name:
    Title:


STATE OF NEW YORK       )
                       ) :SS
COUNTY OF _____ )

    The foregoing instrument was acknowledged before me this the ____ day of _____, 2010, by _____, as _____ of _____, on behalf of the company.

    My commission expires: _____.


_____
NOTARY PUBLIC

4

# EXHIBIT A

SALE ORDER
(attached hereto)

A-1

## EXHIBIT B

### LEGAL DESCRIPTION OF PROPERTY

US 298339v.2