# AMENDED AND RESTATED
## OMNIBUS AGREEMENT

THIS AMENDED AND RESTATED OMNIBUS AGREEMENT (this *"Agreement"*) is made and executed on this 10th day of March, 2010 (the *"Effective Date"*), between ARC TERMINALS LP, a Delaware limited partnership (the *"Proposed Purchaser"*), each of other individuals and entities listed on the signature pages hereto (the *"Shareholders"*, together with the Proposed Purchaser, the *"Parties"* and each individually a *"Party"*) and the each of the entities listed on the joinder signature pages hereto for the purposes set forth therein.

WHEREAS, each Shareholder is an equity owner, in the ownership interest percentages set forth opposite such Shareholder's name in Exhibit A hereto, in of Dunhill Entities, L.P., a Texas limited partnership (*"Dunhill Entities LP"*), Dunhill Entities GP, LLC, a Texas limited liability company (*"Dunhill Entities GP"*), Dunhill Terminals, L.P., a Texas limited partnership (*"Dunhill Terminals LP"*), Dunhill Terminals GP, LLC, a Texas limited liability company (*"Dunhill Terminals GP"*, together with Dunhill Entities LP, Dunhill Entities GP and Dunhill Terminals LP, the *"Dunhill Debtors"*), Sierra Fuels (Alabama) GP, LLC, a Texas limited liability company (*"Sierra Alabama GP"*), Sierra Fuels (Texas) GP, LLC, a Texas limited liability company (*"Sierra Texas GP"*), Sierra Fuels, L.P., a Texas limited partnership (*"Sierra Texas"*), Sierra Fuels (Alabama), L.P., a Texas limited partnership (*"Sierra Alabama"*, together with Sierra Texas, Sierra Texas GP and Sierra Alabama GP, *"Sierra Fuels"*), Delta Hardwoods Corporation, an Alabama corporation (*"Delta Hardwoods"*, together with all of the foregoing, the *"Dunhill Companies"*);

WHEREAS, on or before the Loan Closing Deadline (as defined below), the Proposed Purchaser will consummate the acquisition of certain indebtedness of the Dunhill Debtors more fully described on Exhibit B hereto (the *"Loans"*);

WHEREAS, certain of the Dunhill Companies own and operate petroleum and other product storage facilities and associated terminaling assets located in Chickasaw, Alabama (the *"Chickasaw Terminal"*) and Mobile, Alabama (the *"Blakeley Terminal"*, together with the Chickasaw Terminal, the *"Terminals"*);

WHEREAS, the Proposed Purchaser desires to purchase the Sale Assets (as defined below) and purchase or lease the Chickasaw Property (as defined below) pursuant to the terms set forth herein;

WHEREAS, the Proposed Purchaser desires that the Shareholders perform certain services set forth herein;

WHEREAS, the signatories to this Agreement entered into the Omnibus Agreement dated as of March 5, 2010 (the *"Prior Agreement"*); and

WHEREAS, the signatories to this Agreement desire to amend and restate the Prior Agreement.

US 298777v5

**EXHIBIT**

**G**

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## 1. Voluntary Petition; Proposed Transaction.

(a)     Each Shareholder represents and warrants to the Proposed Purchaser that Exhibit A sets forth the true and correct capitalization of each of the entities listed therein. Each Shareholder has the power and authority to enter into this agreement and to consummate the transactions contemplated hereby.

(b)     The Shareholders and the Proposed Purchaser hereby agree to negotiate and execute, on or before 3:00 p.m. E.S.T. March 10, 2010 (the "*APA Execution Deadline*"), a binding and mutually acceptable asset purchase agreement providing for the sale of certain assets of the Dunhill Companies, including certain assets of the Dunhill Debtors, which shall be, upon execution, deemed to be attached as Exhibit C hereto (the "*Purchase Agreement*"). If such a binding and mutually acceptable asset purchase agreement is not executed by the Shareholders and the Proposed Purchaser by the APA Execution Deadline, then this Agreement shall immediately terminate and no party shall have any further obligations under the terms of this Agreement. On or before 6:00 p.m. E.S.T. March 10, 2010 (the "*Loan Closing Deadline*"), the Proposed Purchaser will consummate the acquisition of the Loans. If the Proposed Purchaser has not consummated the acquisition of the Loans on or before the Loan Closing Deadline, then this Agreement and the Purchase Agreement shall immediately terminate and no party shall have any further obligations under the terms of this Agreement.

(c)     On or before April 1, 2010, the Shareholders shall cause the Dunhill Debtors to file voluntary petitions ("*Voluntary Petitions*") for relief under chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*") in the United States Bankruptcy Court for the Southern District of Alabama (the "*Bankruptcy Court*").

(d)     Simultaneously with the filing of the Voluntary Petitions, the Shareholders shall cause the Dunhill Debtors to file a motion or motions pursuant to Sections 363 and 365 of the Bankruptcy Code in form and substance reasonably acceptable to the Proposed Purchaser and its counsel asking the Bankruptcy Court (i) to approve the Proposed Purchaser as "*Stalking Horse Buyer*" in connection with sale of certain assets (the "*Sale Assets*") of the Dunhill Debtors defined as the "Purchased Assets" in the Purchase Agreement, (ii) to establish bidding procedures, in form and substance reasonably acceptable to the Proposed Purchaser and its counsel, for any competing purchase offers (the "*Bid Procedures*"), (iii) to schedule a hearing on the approval of the Proposed Purchaser as Stalking Horse Buyer and establishment of the Bid Procedures, and (iv) to approve the transaction contemplated in the Purchase Agreement (collectively, the "*Approval Motion*"). The Approval Motion shall be in form and substance reasonably acceptable to the Proposed Purchaser and its counsel. Each Shareholder shall cause the Dunhill Debtors to use their best efforts to obtain an order within twenty (20) days of the Voluntary Petition filing, approving the Proposed Purchaser as Stalking Horse Buyer, and establishing the Bid Procedures. All of the foregoing shall be deemed the "*Proposed Transaction*".

2

(e)     The Parties shall pursue the Proposed Transaction in good faith. Each Shareholder agrees not to, and shall cause the Dunhill Companies and their respective Representatives not to, until the entry of an order of the Bankruptcy Court approving the Bid Procedures, directly or indirectly (i) enter into any agreements, understandings or negotiations, or solicit, initiate or encourage any inquiries, proposals or offers from any person other than the Proposed Purchaser relating to any acquisition or purchase of any of the Sale Assets or any of the equity of any of the Dunhill Companies, or any merger, consolidation or business combination with, any such entity, or the Chickasaw Property; or (ii) with respect to any effort or attempt by any other person to do or to seek any of the foregoing, (A) participate in any discussions or negotiations; (B) furnish to any other person any information provided by or on behalf of the Dunhill Companies, relating to the Sale Assets or deriving, containing or reflecting such information through observation, analysis or interpretation from such information with respect to the Dunhill Companies or their business, other than in the ordinary course of business; or (C) otherwise cooperate in any way with, or assist or participate in, or facilitate or encourage any such effort. Each Shareholder represents and warrants to the Proposed Purchaser that neither it nor any of the Dunhill Companies' Representatives is a party to any letter of intent, agreement or understanding (except this Agreement) relating to any purchase or other transaction involving any of the Sale Assets or the Chickasaw Property or any merger, consolidation, sale, or other business combination or change in control of any such entity, or which otherwise could prevent or restrict any of the undersigned from entering into this Agreement and performing its obligations hereunder. The Shareholders, the Dunhill Companies or a Representative thereof will use their best efforts to notify the Proposed Purchaser within 24 hours regarding any contact between the Shareholders, the Dunhill Companies or any of their Representatives and any other person regarding any such offer or proposal or any related inquiry. As used in this Agreement, the term *"Representatives"* means, as to any person, such person's affiliates and its and their directors, officers, employees, agents and advisors (including, without limitation, financial advisors, consultants, counsel and accountants. As used in this Agreement, the term "person" shall be broadly interpreted to include, without limitation, any corporation, company, partnership, or other entity or individual.

(f)     The Shareholders agree to fully and completely cooperate with the Proposed Purchaser until a Final Order is issued or, if the Proposed Purchaser is the selected bidder pursuant to the Final Order, until the Proposed Transaction is consummated. If the Proposed Purchaser is the selected bidder pursuant to the Final Order, the Shareholders will assist the Proposed Purchaser in an orderly, efficient and timely transfer of the assets through the bankruptcy process so that the change of ownership can be accomplished as quickly as possible and with minimum interference to the operation of the Terminals' business. The Shareholders acknowledge that the Proposed Purchaser will undertake substantial cost, expense, and effort to conduct due diligence activities, prepare documents and undertake other activities in connection with the Proposed Transaction. Failure by any of the Shareholders to fully and completely cooperate with the bankruptcy process or the Proposed Transaction sale proceedings in any respect shall be deemed, at the Proposed Purchaser's sole discretion, an event of default and this Agreement may be deemed null and void. As used in this Agreement, the term *"Final Order"* means a final, binding and nonappealable order issued by the Bankruptcy Court approving the Proposed Transaction or selecting an alternate, higher bidder.

3

2. **Non-Compete; Consulting; Release of Guarantees.**

(a)     The Shareholders agree that, for the duration of the Non-Compete Period, they will not, and they will cause their officers, subsidiaries and affiliates not to, anywhere within the state of Alabama, except in accordance with the Proposed Purchaser's prior written consent, directly or indirectly, own, acquire, finance, construct or assist in the operation of any facility or asset for the storage (short-term or long-term) of Petroleum and Other Products (as defined in the Purchase Agreement). For purposes of this Agreement, the *"Non-Compete Period"* means (i) if the Proposed Purchaser is the selected bidder pursuant to the Final Order and the Proposed Transaction is consummated, a period of two (2) years from the Effective Date or (ii) otherwise, until the earlier of a period of two (2) years from the Effective Date or the date which the Proposed Purchaser recovers the Minimum Recovery Amount pursuant to Section 2(d).

(b)     The Shareholders hereby agree that the covenants set forth in this Section 2 are a material and substantial part of the transactions contemplated by this Agreement. The Shareholders acknowledge that (i) the provisions of this Section 2 are reasonable and necessary to protect the legitimate interests of the Proposed Purchaser and its affiliates, (ii) any violation of this Section 2 will result in irreparable injury to the Proposed Purchaser and its affiliates and that damages at law would not be reasonable or adequate compensation to the Proposed Purchaser and its affiliates for a violation of this Section 2, and (iii) the Proposed Purchaser and its affiliates shall be entitled to have the provisions of this Section 2 specifically enforced by preliminary and permanent injunctive relief without the necessity of proving actual damages and without posting bond or other security as well as to an equitable accounting of all earnings, profits and other benefits arising out of any violation of this Section 2, including, without limitation, estimated future earnings lost as a result of a violation of this Section 2. In the event that the provisions of this Section 2 should ever be deemed to exceed the time, geographic, product or any other limitations permitted by applicable law, then such provisions shall be deemed reformed to the maximum extent permitted by law.

(c)     Each Shareholder shall supply consulting services relating to the business of the Terminals to the Proposed Purchaser as may be reasonably requested by the Proposed Purchaser in connection with the Proposed Transaction (the *"Services"*) for the duration of the Non-Compete Period. The Proposed Purchaser shall reimburse the Shareholders in connection with any reasonable out-of-pocket costs and expenses incurred in rendering Services requested by the Proposed Purchaser. In providing the Services, each Shareholder shall provide the Proposed Purchaser with such of his assessments and evaluations as the Proposed Purchaser may deem necessary. The Shareholders agree to attend such meetings as the Proposed Purchaser may require for proper communication of his advice and consultation. The Proposed Purchaser shall coordinate the furnishing of the Services pursuant to this Agreement with the Shareholders in order that such services can be provided in such a way as to generally conform to the business schedules of the Proposed Purchaser, but the method of performance, time of performance, place of performance, hours utilized in such performance, and other details of the manner of performance of the Shareholders' services hereunder shall be within the sole control of each Shareholder. Subject to Section 2(a), while retained as a consultant by the Proposed Purchaser, each Shareholder shall have the right to devote his business day and working efforts to other business and professional opportunities as do not interfere (as determined by mutual agreement

4

of the Proposed Purchaser and the Shareholder) with the rendering of consulting services to the Proposed Purchaser.

(d) Subject to the following sentence and Section 2(e), the Proposed Purchaser shall release, or cause to be released, the guarantees (the "*Guarantees*"), more fully described on Exhibit D hereto, made by certain Shareholders in connection with certain obligations of the Dunhill Companies under the Loans upon the expiration of the Non-Compete Period provided that all Shareholders shall have fully complied with the terms of this Agreement. Subject to Section 2(e), the Guarantees shall only be released:

(i) if the Proposed Purchaser shall have successfully acquired the Sale Assets pursuant to the Proposed Transaction approved in a Final Order, to the extent set forth in Section 2(e) below; or

(ii) if the Proposed Purchaser shall not have successfully acquired the Sale Assets pursuant to the Proposed Transaction approved in a Final Order, to the extent the Proposed Purchaser recovers an amount, in respect of the Loans, equal to 110% of the sum of the purchase price paid by the Proposed Purchaser to acquire the Loans and all costs and expenses incurred by Proposed Purchaser in connection with the Proposed Transaction and the Loans (the "*Minimum Recovery Amount*").

(e) If any indemnity claims by a Buyer Indemnitee (as such term is defined in the Purchase Agreement) have been made under Article VII of the Purchase Agreement and are pending at the time as a Guarantee is to be released pursuant to Section 2(d)(i) above, the Proposed Purchaser shall only release the Guarantees to the extent they exceed the aggregate amount of such indemnity claims. The remaining balance of the Guarantees shall be (i) applied to indemnity claims of the Buyer Indemnitees, in addition to (and not prior or subsequent to) the provisions of the Purchase Agreement, and (ii) thereafter released upon resolution of the indemnity claim pursuant to the terms of Article VII of the Purchase Agreement.

## 3. Option to Purchase.

(a) The Shareholders, Delta Hardwoods and Sierra Fuels hereby give the Proposed Purchaser an exclusive, irrevocable option (the "*Option*") to purchase for a purchase price of One Dollar and No Cents ($1.00), at its sole discretion, on or prior to March 10, 2020, on the terms set forth in this Section 3:

(i) the property more particularly described on Exhibit E hereto (the "*Chickasaw Property*"), including any interest in the Chickasaw Property held by any affiliate or subsidiary of Delta Hardwoods or Sierra Fuels; or

(ii) all of the outstanding and issued stock of Delta Hardwoods (the "*Delta Stock*"), free and clear of all liens and encumbrances or other restrictions.

(b) If the Proposed Purchaser has not paid a sum of Fifty Thousand Dollars and No Cents ($50,000.00) (the "*Option Consideration*") to the Shareholders, in respect of the

5

Option, on or before ninety (90) days following entry of the Final Order, the Option shall expire, be null and void.

(c)     Contemporaneous with the execution of the Purchase Agreement, the Proposed Purchaser, Delta Hardwoods and Sierra Fuels shall execute a notice of option to purchase the Chickasaw Property in the form attached hereto as Exhibit F.

(d)     The Proposed Purchaser shall give the Shareholders, Delta Hardwoods and Sierra Fuels five (5) days' notice in writing of its election to exercise the Option and shall specify in such notice whether the election is to purchase the Chickasaw Property or the Delta Stock (the "*Exercise Notice*").

(e)     If the Proposed Purchaser exercises the Option to purchase the Delta Stock, the Parties will effectuate the transaction, pursuant to reasonably and customary documentation, as soon as reasonably practicable following the Exercise Notice.

(f)     If the Proposed Purchaser exercises the Option to purchase the Chickasaw Property, Delta Hardwoods shall convey, subject to Section 3(g), marketable and insurable title to the Chickasaw Property in fee simple by good and sufficient warranty deed, free and clear of all liens, encumbrances, easements or restrictions whatsoever other than those shown on the title policy satisfactory to the Proposed Purchaser and the mortgage in favor of Texas Community Bank in the amount of approximately $2.0 million (the "*TCB Mortgage*"). Sierra Fuels shall take all necessary actions, including joining any conveyance by Delta Hardwoods to the Proposed Purchaser, to ensure that Chickasaw Property is conveyed to Proposed Purchaser pursuant to this Section 3. Settlement of the purchase price and conveyance to the Proposed Purchaser shall be made within thirty (30) days from the date of the Exercise Notice. Taxes, utilities, rents and other current expenses shall be adjusted as of the date of closing of the purchase of the Chickasaw Property.

(g)     The parties hereto agree that the purchase of the Chickasaw Property shall not be consummated earlier than January 1, 2014, unless (i) the Proposed Purchaser agrees (in its sole discretion) to pay an amount equal to (without duplication) any taxes imposed on Delta Hardwoods under Section 1374 of the Internal Revenue Code of 1986, as amended (the "*Code*"), that are attributable to Proposed Purchaser's purchase of the Chickasaw Property (reduced by any tax benefit realized by the shareholders of Delta Hardwoods under Section 1366(f)(2) of the Code), or (ii) the parties can structure and effectuate the sale of the Chickasaw Property to Proposed Purchaser in the manner that eliminates or minimizes, to the extent permissible under applicable law, the amount of any such taxes imposed under Section 1374 of the Code. Notwithstanding anything to the contrary herein, if the TCB Mortgage is repaid, has been assigned, sold or otherwise transferred to a mortgagee other than the Proposed Purchaser, or there has been a foreclosure in connection with the TCB Mortgage, the Proposed Purchaser may immediately exercise the Option to purchase the Chickasaw Property. Notwithstanding any provision in this Agreement to the contrary, the Proposed Purchaser shall in no event be required to purchase the stock of Delta Hardwoods.

(h)     If the Proposed Purchaser has not exercised the Option on or prior to March 10, 2020, the Shareholders, Delta Hardwoods and Sierra Fuels may jointly, with written notice,

6

require the Proposed Purchaser to exercise the Option to purchase the Chickasaw Property on or before March 15, 2020.

(i)     On or before the payment of the Option Consideration, the Proposed Purchaser, at its election, and the Shareholders, Delta Hardwoods and Sierra Fuels shall enter into a ground lease in form and substance satisfactory to the Proposed Purchaser, which shall include, among others, the terms set forth in Exhibit G, in which case the Proposed Purchaser shall also elect to terminate the existing ground lease on the Chickasaw Property, with the consent of Regions Bank (or its successor-in-interest), as required under the Loans.

4.     **Independent Interim Manager and Restructuring Advisor.**  Upon the filing of the Voluntary Petitions, the Shareholders will cause the Dunhill Debtors (i) to appoint Gulf Atlantic Capital Corporation, subject to the approval of the Bankruptcy Court, as an interim restructuring advisor to the Dunhill Debtors and (ii) to appoint, subject to the approval of the Bankruptcy Court and the Proposed Purchaser, until the consummation of a sale of the Sale Assets pursuant to a Final Order, an independent interim operations manager of the Terminals selected from a list of three or more independent operations managers mutually agreeable to the Dunhill Debtors and the Proposed Purchaser.

5.     **Payment; Escrow Deposit.**  In connection with this Agreement and in consideration of the agreements of the Shareholders herein, including the provision of Services by Shareholders pursuant to Section 2, the Proposed Purchaser shall, contemporaneously with the execution and delivery by all the Shareholders, Delta Hardwoods and Sierra Fuels of their respective counterpart signature pages to this Agreement and the Purchase Agreement, deliver the sum of One Hundred Thirty Eight Thousand Seven Hundred Fifty Dollars and No Cents ($138,750.00) to the Shareholders' counsel, Seyfarth Shaw LLP (*"Shareholders' Counsel"*), to be held, safeguarded and released by Shareholders' Counsel in the amount set forth opposite each Shareholder's name under Column 1 of Exhibit H hereto upon the filing of the Voluntary Petitions by the Dunhill Debtors and the commencement of a chapter 11 bankruptcy proceeding in the Bankruptcy Court pursuant thereto. If the Voluntary Petitions are not filed or a case has not commenced for any reason within twenty (20) days of the Effective Date, the foregoing amount shall be, and Shareholders shall cause such amount to be, promptly returned by Shareholders' Counsel to the Proposed Purchaser. Upon the filing of the Voluntary Petitions and commencement of the case pursuant thereto, the Proposed Purchaser shall deliver the sum of Eight Hundred Thirty One Thousand Two Hundred Fifty Dollars and No Cents ($831,250.00) (the *"Escrow Amount"*) to an escrow agent mutually acceptable to Shareholders and the Proposed Purchaser (the *"Escrow Agent"*) to be held, safeguarded and released by the Escrow Agent to the Shareholders (A) in the amount set forth opposite each Shareholder's name under Column 2 of Exhibit H hereto upon entry of an order by the Bankruptcy Court approving the Bid Procedures within thirty (30) days of the filing of the Voluntary Petitions and (B) in the amount set forth opposite each Shareholder's name under Column 3 of Exhibit H hereto upon (i) the entry of a Final Order and (ii) the consummation of the purchase of the Sale Assets by the bidder selected by the Bankruptcy Court pursuant to the Final Order. If an order by the Bankruptcy Court approving the Bid Procedures is not entered within thirty (30) days of the filing of the Voluntary Petitions, the Escrow Deposit shall be, and the Shareholders shall cause such amount to be, promptly returned by the Escrow Agent to the Proposed Purchaser.

7

## 6.   Release of Claims and Indemnification.

(a)   For good and valuable consideration, the receipt and sufficiency of which each Releasing Party expressly acknowledges,

(i)   each Dunhill Company, each Shareholder, Dunhill Products and MTT hereby RELEASE, ACQUIT, AND FOREVER DISCHARGE each of the Dunhill Debtors, the Proposed Purchaser and its affiliates;

(ii)   MTT hereby RELEASES, ACQUITS, AND FOREVER DISCHARGES each of the Shareholders; and

(iii)   each Shareholder hereby RELEASES, ACQUITS, AND FOREVER DISCHARGES MTT; and

(iv)   each Dunhill Company, each Shareholder and MTT hereby RELEASE, ACQUIT, AND FOREVER DISCHARGE Dunhill Products;

in each case, from the Released Matters.  Each Releasing Party further agrees, and agrees to cause MTT, Dunhill Companies and Dunhill Products, never to commence, benefit from or accept any actions, suits, proceedings, losses, damages, claims, liabilities, demands, assessments, judgments, orders, awards, rulings, injunctions, decrees, costs and expenses, including reasonable attorneys' fees ("*Damages*") arising from any legal action or other proceeding based in whole or in part upon the foregoing Released Matters and will reimburse any Released Party for any and all costs, judgments, liabilities, expenses and fees (including any and all reasonable attorneys' fees) that such Released Party may incur in connection with any such legal action or other proceeding.  The parties hereto agree that this release is an essential and material term of this Agreement.   Each party has consulted with legal counsel before signing this Agreement and executes this Agreement voluntarily, with the intention of fully and finally extinguishing all of the Released Matters.

(b)   In connection with the release set forth in Section 6(a) above, each Releasing Party hereby agrees to defend, indemnify and hold harmless each of the Released Parties from and against any and all Claims arising under or encompassed by the Released Matters that are asserted against such other party by or on behalf of it after the date hereof.

(c)   For purposes of this Agreement,

(i)   "*Claims*" means all theories of recovery of whatever nature, whether known or unknown, now or hereafter recognized by the law or equity of any jurisdiction, including any and all causes of action, charges, indebtedness, losses, claims, liabilities, demands, obligations, promises, agreements, controversies, actions, rights, costs, compensation, expenses and Damages, whether arising in equity or under the common law or under any contract or statute.

(ii)   "*Dunhill Products*" means Dunhill Products, L.P., a Texas limited partnership.

8

(iii) **"MTT"** means Marine Tank Terminals, Inc. an Alabama corporation.

(iv) **"Released Matters"** means any and all:

    (A) Claims of whatsoever kind or nature in the case of Section 6(a)(i);

    (B) Claims relating to the ownership or investment in the Dunhill Debtors in the case of Sections 6(a)(ii) and (iii); and

    (C) Claims relating to the indebtedness listed on Exhibit B, #5 in the case of Section 6(a)(iv);

in each case, that a Releasing Party might have because of anything done, omitted, suffered, or allowed to be done by any of the foregoing on or before the date hereof, WHETHER HERETOFORE OR HEREAFTER ACCRUING, WHETHER FORESEEN OR UNFORESEEN, OR WHETHER KNOWN OR UNKNOWN TO THE PARTIES.

(v) **"Releasing Party"** means each Dunhill Company, each Shareholder, Dunhill Products and MTT for the purposes of Section 6(a)(i); MTT for the purposes of Section 6(a)(ii); Shareholders for the purposes of Section 6(a)(iii); and each Dunhill Company, each Shareholder and MTT for the purposes of Section 6(a)(iv).

(vi) **"Released Party"** means the Dunhill Debtors, the Proposed Purchaser and its affiliates for the purposes of Section 6(a)(i); Shareholders for the purposes of Section 6(a)(ii); MTT for the purposes of Section 6(a)(iii); and Dunhill Products for the purposes of Section 6(a)(iv).

**7.     Loans.** All of the parties hereto stipulate and agree that (i) the aggregate principal amount due and owing on the Loans is not less than $58,355,441 and that such Loans are secured by a valid, binding, first and prior, duly perfected security interest in the Collateral (as defined in the Purchase Agreement) and (ii) the Loans and Collateral are not subject to any defense, affirmative defense, avoidance, offset, claim, counterclaim or attack under any legal or equitable theory.

**8.     Confidentiality.** Except as required by law, until the Voluntary Petitions are filed, unless otherwise agreed in writing by the other Parties, each Party agrees not to disclose to any person (other than those of its Representatives who are actively and directly participating in the Party's evaluation of the Proposed Transaction and need to know for purposes of evaluating the Proposed Transaction and, in the case of the Party's Representatives, whom the Party will cause to observe the terms of this Agreement) any information about the Proposed Transaction, or the terms or conditions or any other facts relating thereto, including, without limitation, the fact that discussions are taking place with respect thereto or the status thereof, or the fact that information about the Dunhill Companies has been made available to the Proposed Purchaser or its Representatives.

9

**9.    Public Disclosure.** Except as required by law, all press releases or other public communications of any sort relating to this Agreement or the Proposed Transaction and the method of the release for publication thereof will be subject to the prior written approval of each of the Parties, which prior approval shall not be unreasonably withheld by any other Party, provided that nothing herein shall prevent the Parties from making such disclosures as may be required by law.

**10.    Expenses.** Each of the Parties hereto will bear and pay all costs and expenses incurred by it with respect to the Proposed Transaction and any other transactions contemplated herein and all investigations and proceedings in connection therewith including, without limitation, fees and expenses of their respective legal counsel, accountants and financial advisors.

**11.    General Provisions.**

(a)    Severability. It is the desire and intent of the parties hereto that the provisions of this Agreement be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought. Accordingly, if any particular provision of this Agreement shall be adjudicated by a court of competent jurisdiction to be invalid, prohibited or unenforceable for any reason, such provision, as to such jurisdiction, shall be ineffective, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction. Notwithstanding the foregoing, if such provision could be more narrowly drawn so as not to be invalid, prohibited or unenforceable in such jurisdiction, it shall, as to such jurisdiction, be so narrowly drawn, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

(b)    Entire Agreement; Assignment. This Agreement constitutes the entire agreement between the Parties and supersedes all prior oral or written agreements, understandings, representations and warranties and courses of conduct and dealings between the Parties on the subject matter thereof. Except as otherwise provided herein, this Agreement may be amended or modified only by a writing executed by both of the Parties. This Agreement shall not be assigned by any Party without the prior written consent of the other Parties, except that this Agreement may be assigned by Proposed Purchaser to an affiliate without consent of the Shareholders or the Dunhill Companies.

(c)    Counterparts. This Agreement may be executed in separate counterparts, each of which is deemed to be an original and all of which taken together constitute one and the same agreement. This Agreement may be executed and delivered by electronic means, including facsimile and portable document format (PDF), and such execution and delivery shall be deemed effective as originals.

(d)    Governing Law; Venue. This Agreement shall be governed in all respects, including validity, interpretation and effect, by the laws of the State of Alabama without giving effect to the provisions thereof relating to conflict of laws. The parties hereto consent that venue

of any action instituted under this Agreement shall be proper in the federal district court for the Southern District of Alabama located in Mobile, Alabama, and hereby waive any objection to such venue.

(e)    Remedies.    Each of the parties to this Agreement and any such person granted rights hereunder whether or not such person is a signatory hereto shall be entitled to enforce its rights under this Agreement specifically to recover damages and costs (including reasonable attorney's fees) for any breach of any provision of this Agreement and to exercise all other rights existing in its favor. The parties hereto agree and acknowledge that money damages may not be an adequate remedy for any breach of the provisions of this Agreement and that any party and any such person granted rights hereunder whether or not such person is a signatory hereto may in its sole discretion apply to any court of law or equity of competent jurisdiction for specific performance and/or other injunctive relief (without posting any bond or deposit) in order to enforce or prevent any violations of the provisions of this Agreement.

(f)    Amendment and Waiver.    The provisions of this Agreement may be amended and waived only with the prior written consent of the Parties and no course of conduct or failure or delay in enforcing the provisions of this Agreement shall be construed as a waiver of such provisions or affect the validity, binding effect or enforceability of this Agreement or any provision hereof.

(g)    Notices.    Any notice provided for in this Agreement must be in writing and must be either personally delivered, transmitted via facsimile, mailed by first class mail (postage prepaid and return receipt requested) or sent by reputable overnight courier service (charges prepaid) to the recipient at the address below indicated or at such other address or to the attention of such other person as the recipient party has specified by prior written notice to the sending party. Notices will be deemed to have been given hereunder and received when delivered personally, when received if transmitted via facsimile, five (5) days after deposit in the U.S. mail and one (1) day after deposit with a reputable overnight courier service.

If to Proposed Purchaser:

> Arc Terminals LP
> c/o Arc Terminals Holdings LLC
> 3000 Research Forest Drive
> Suite 250
> The Woodlands, TX 77381
> Facsimile: (212) 888-2854
> Attention: John S. Blanchard

with a required copy to:

> Lightfoot Capital Partners, LP
> 725 Fifth Avenue, 19th Floor
> New York, NY 10022
> Facsimile: (212) 888-2855
> Attention: Vincent T. Cubbage

If to the Shareholders or the Dunhill Companies, as set forth on Exhibit I.

11

(h)    <u>Descriptive Headings</u>.  The descriptive headings of this Agreement are inserted for convenience only and do not constitute a part of this Agreement.

(i)    <u>Construction</u>.  Where specific language is used to clarify by example a general statement contained herein, such specific language shall not be deemed to modify, limit or restrict in any manner the construction of the general statement to which it relates.  The language used in this Agreement shall be deemed to be the language chosen by the parties to express their mutual intent, and no rule of strict construction shall be applied against any party.

(j)    <u>WAIVER OF JURY TRIAL</u>.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT.

(k)    <u>Nouns and Pronouns</u>.  Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

PROPOSED PURCHASER:

**ARC TERMINALS LP**

By: Arc Terminals GP LLC, its general partner

By: _Vincent T. Cubbage_

Name: Vincent T. Cubbage

Title: Authorized Person

*Signature Page to Amended and Restated Omnibus Agreement*

SHAREHOLDERS:

_____
HENRY WUERTZ

_____
STEVEN FRIETSCH

_____
SCOTT CLEVELAND

_____
STRYKER EMMERTON

_____
PATRICIA WATERS

_____
ALISTAIR BARNES

_____
SHAWN POTTS

*Signature Page to Amended and Restated Omnibus Agreement*

SHAREHOLDERS:

_____
HENRY WUERTZ

_____
STEVEN FRIETSCH

_____
SCOTT CLEVELAND

_____
STRYKER EMMERTON

_____
PATRICIA WATERS

_____
ALISTAIR BARNES

_____
SHAWN POTTS

*Signature Page to Amended and Restated Omnibus Agreement*

SHAREHOLDERS:

_____

HENRY WUERTZ

_____

STEVEN FRIETSCH

_____

SCOTT CLEVELAND

_____

STRYKER EMMERTON

_____

PATRICIA WATERS

_____

ALISTAIR BARNES

_____

SHAWN POTTS

*Signature Page to Amended and Restated Omnibus Agreement*

SHAREHOLDERS:

_____

HENRY WUERTZ

_____

STEVEN FRIETSCH

_____

SCOTT CLEVELAND

_____

STRYKER EMMERTON

_____

PATRICIA WATERS

_____

ALISTAIR BARNES

_____

SHAWN POTTS

*Signature Page to Amended and Restated Omnibus Agreement*

SHAREHOLDERS:

_____

HENRY WUERTZ


_____

STEVEN FRIETSCH


_____

SCOTT CLEVELAND


_____

STRYKER EMMERTON


_____

PATRICIA WATERS

_____

ALISTAIR BARNES

Attorney-in-fact

_____

SHAWN POTTS

*Signature Page to Amended and Restated Omnibus Agreement*

**EMMERTON LLC #1**

By: _Stryker Emmerton_
Name: _Stryker Emmerton_
Title:

**SC TRADING LLC**

By: _____
Name:
Title:

**PITTSBURGH OIL**

By: _____
Name: **Shawn Potts**
Title: **President**

**DUNHILLS ENTITIES GP, LLC**

By: _____
Name:
Title:

**DUNHILLS TERMINALS GP, LLC**

By: _____
Name:
Title:

*Signature Page to Amended and Restated Omnibus Agreement*

**EMMERTON LLC #1**

By: _____
Name:
Title:

**SC TRADING LLC**

By: _____
Name: Scott Cleveland
Title: President

**PITTSBURGH OIL**

By: _____
Name:
Title:

**DUNHILLS ENTITIES GP, LLC**

By: _____
Name:
Title:

**DUNHILLS TERMINALS GP, LLC**

By: _____
Name:
Title:

*Signature Page to Amended and Restated Omnibus Agreement*

**EMMERTON LLC #1**

By: _____
Name:
Title:


**SC TRADING LLC**

By: _____
Name:
Title:


**PITTSBURGH OIL**

By: _____
Name:
Title:


**DUNHILLS ENTITIES GP, LLC**

By: _____
Name: Patricia Waters
Title: CFO


**DUNHILLS TERMINALS GP, LLC**

By: _____
Name: Patricia Waters
Title: CFO


*Signature Page to Amended and Restated Omnibus Agreement*

SIERRA FUELS (TEXAS) GP, LLC

By: _____
Name: Patricia Waters
Title: CFO


SIERRA FUELS (ALABAMA) GP, LLC

By: _____
Name: Patricia Waters
Title: CFO

*Signature Page to Amended and Restated Omnibus Agreement*

<u>JOINDER</u>

The undersigned join this Agreement solely to evidence their consent to, acknowledgment of and agreement to be bound by the terms of Sections 3 and 6 hereof.

**DELTA HARDWOODS CORPORATION**

By: _____
    Name: Patricia Wattes
    Title: CFO

**SIERRA FUELS (ALABAMA) GP, LLC**

By: _____
    Name: Patricia Wattes
    Title: CFO

**SIERRA FUELS (TEXAS) GP, LLC**

By: _____
    Name: Patricia Wattes
    Title: CFO

**SIERRA FUELS (ALABAMA), L.P.**

By: Sierra Fuels (Alabama) GP, LLC, its general partner

By: _____
    Name: Patricia Wattes
    Title: CFO

*Signature Page to Amended and Restated Omnibus Agreement*

SIERRA FUELS, L.P.

By: Sierra Fuels (Texas) GP, LLC, its general
partner

By: _____
Name: Patricia Waters
Title: CFO

DUNHILL PRODUCTS, L.P.

By: Dunhill Products GP LLC its general
partner

By: _____
Name: Patricia Waters
Title: CFO

*Signature Page to Amended and Restated Omnibus Agreement*

MARINE TANK TERMINALS, INC.

By:
Name: _Scott C. Copeland_
Title: _President_

*Signature Page to Amended and Restated Omnibus Agreement*